EL PUEBLO DE PUERTO RICO, apelado, *v.* MIGUEL A. LÓPEZ RIVERA, acusado y apelante.

*Número:* CR-79-56        *Resuelto:* 18 de octubre de 1979

*José A. Andreu García* y *Manuel E. Andreu García*, abogados del apelante; *Héctor A. Colón Cruz, Procurador General*, y *Miguel A. Santana Bagur, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

El apelante se sometió a juicio por tribunal de derecho bajo acusación de asesinato en primer grado. La prueba de cargo no controvertida por la defensa estableció que el 20 de octubre de 1976 y en Trujillo Alto, mientras la joven Ivonne Vélez se inclinaba sobre la puerta del automóvil de su novio, despidiéndose de éste, se presentó el acusado hablando palabras obscenas, la empujó hacia la derecha y con un revólver disparó contra Marino Santiago Bosch quien se hallaba sentado en el interior del coche, dándole muerte. Ivonne describe la actitud del apelante en ese momento como de loco, histérico, furioso y enojado. Después de disparar el revólver el acusado se volvió hacia ella y le dijo: "Te confundí, me confundí; lo voy a llevar al hospital" (E.N.P. pág. 3); montó en el propio vehículo del herido, lo echó hacia un lado y lo llevó al hospital.

La teoría de defensa ([1]) anunciada en el juicio fue de locura, con introducción del arrebato de cólera que caracteriza

---

([1])A las págs. 5 y 6, E.N.P., el abogado defensor expuso la teoría de defensa así:

"La defensa acepta que los hechos que se le imputan al acusado ocurrieron, extrínsecamente, en la forma como lo estableció la prueba de cargo. Sin embargo, presentaremos prueba para demostrar que esos hechos tienen una explicación sicológica y siquiátrica, la cual conduce a dos consecuencias legales, o sea, a ambas.

"Es nuestra contención que el acusado obró bajo un estado mental de tal naturaleza que produjo en él un estado anímico, que llamamos en Derecho arrebato de cólera, y que, adicionalmente, le incapacitó para formar la intención criminal que requiere nuestro ordenamiento jurídico para que una persona sea responsabilizada penalmente por sus actos, esto es, para comprender la criminalidad del acto o para conducirse de acuerdo con el mandato de Ley."

el homicidio voluntario. Cuatro médicos, un sicólogo clínico y tres siquiatras,[2] llamados como peritos por la defensa sostuvieron que el acusado es un enfermo mental que padece de esquizofrenia con rasgos paranoicos y que dio muerte a su víctima dominado por un incontrolable brote sicótico. Para refutarlos, el fiscal presentó al Dr. Fernández Cuevas, Director Médico del Programa de Siquiatría Forense, quien sostuvo que lo sufrido por el acusado el día de autos no fue brote sicótico sino exabrupto que no derrotaba su control, como entre otros detalles del suceso, lo demuestra su aptitud para conducir el automóvil hacia el hospital (E.N.P. pág. 49) y que su reacción en aquel momento fue de tipo esquizoide y paranoide que no le impedía al acusado conocer la criminalidad del acto y sujetarse al mandato de la ley (E.N.P. págs. 49–50). Además de esta evidencia pericial se admitieron testimonios de compañeros de trabajo del acusado que le describieron como irritable e impaciente,[3] que tomaba *valium*, impulsivo; que se "llevaba mal" con abogados y empleados; que era desesperado y todo lo quería de momento. También hubo prueba sobre su niñez y adolescencia que lo muestra de personalidad inquieta que perturbaba a los maestros porque "se movía mucho en el asiento"; que antes fue callado y

---

[2]Dr. Sifre Franco; Dr. David Caiseda, quien admitió la posibilidad de que una persona en brote sicótico pueda "darse cuenta de lo que hace" y "explicó que en el acusado la esquizofrenia no le imposibilita funcionar como abogado o Comisionado, porque su grado de inteligencia superior lo ayuda". (E.N.P. pág. 21). Dr. Julio E. Frank, quien ve difícil que el acusado pueda bregar como abogado porque le faltan el buen juicio y la calma (E.N.P. págs. 32–33); y Dr. Guillermo Santiago. A la fecha del juicio el acusado no tenía historial delictivo ni médico de su condición.

[3]Un alguacil de la Comisión Industrial declaró que el acusado era muy estricto y exigente y los demás empleados no lo pasaban (E.N.P. pág. 37); un abogado dijo tener la creencia de que el acusado estaba loco porque maltrataba a los abogados y a las partes y con frecuencia exclamaba en sesión pública: ¡Qué abogados más brutos postulan aquí!, y que se había acercado al fiscal para la "posibilidad de que le den un homicidio involuntario", (E.N.P. págs. 6–7); otro abogado declaró que el acusado le quitaba el caso a los abogados y conducía él mismo los interrogatorios; que el acusado trató de arreglar la Comisión y acostumbraba ver casos en ausencia de los abogados (E.N.P. pág. 8); y una taquígrafa declaró que el día de autos el acusado presidió la Sala "C"; firmó resoluciones y atendió su labor hasta las 4:30 P.M.

retraído, ignoraba los juguetes y su pasatiempo era los animales. (E.N.P. pág. 38.) Por El Pueblo declararon amigos del apelante: un supervisor de la Autoridad de Acueductos que iba con el acusado al hipódromo y a ver los caballos que él tenía, y con él jugaba billar y dominó; un empleado de supermercado donde compraba el acusado, y el barbero que lo recortaba, todos los cuales lo conocieron por años como persona normal. (E.N.P. págs. 56–57.)

Después de un largo juicio que tomó desde el 16 enero, hasta el 8 de febrero, 1978 el juez declaró al acusado culpable de homicidio voluntario y le impuso una pena de seis a diez años de reclusión, sentencia que fue suspendida bajo régimen probatorio. Su recurso de apelación descansa en señalamiento único de error que expone así:

"Incidió el Tribunal de Instancia al declarar al acusado culpable del delito de Homicidio Voluntario, a pesar de que la evidencia demostró, cuanto menos, la existencia de duda razonable y fundada respecto a la capacidad mental del acusado para sujetarlo a responsabilidad criminal por los hechos cometidos por éste."

El elemento exasperante que desencadenó esta tragedia entró al récord en la parte del testimonio de uno de los siquiatras que el Procurador resume así:

"Según el Dr. Caiseda, el apelante le manifestó que el día anterior al que ocurrieron los hechos había tenido problemas con su esposa por celos; que ese día no pudo dormir y que su esposa lo había botado de la casa. Que el día de los hechos llegó a su casa y al no encontrar a nadie decidió buscar a su esposa e hijos por la urbanización y en el Centro Comercial. Como no los encontró, regresó a su casa y se tomó una cerveza. Que estando en el cuarto del baño oyó un automóvil que se estacionó poco más adelante de su casa, y pudo ver por la ventana del cuarto del baño a una mujer con un turbante rojo, ella con el brazo echado, y salió corriendo con el revólver; que ella estaba de espaldas y le disparó. Se dio cuenta que ella no era su esposa, admite su confusión, y llevó al herido al Cuartel

de Trujillo Alto para que de allí lo llevaran al hospital. [E.N.P. pág. 18]."

Ordena el Art. 30 del Código Penal, 33 L.P.R.A. sec. 3152:

"No es imputable el que en el momento del hecho, a causa de enfermedad o defecto mental, careciere de capacidad suficiente para comprender la criminalidad del acto o para conducirse de acuerdo con el mandato de ley.

Los términos enfermedad o defecto mental no incluyen una anormalidad manifiesta sólo por reiterada conducta criminal o antisocial."

Este artículo exime de culpa al loco que obra a impulsos de una causa invencible, totalmente extraña a la libre voluntad, de que carece.

La evidencia, tanto pericial como de testigos, en la suma total de su caracterización de la personalidad del apelante, de su conducta el 20 de octubre de 1976, y el desarrollo de su vida en la que llegó a recibirse de abogado y a ocupar un cargo público de alta jerarquía y función cuasi judicial como lo es el de comisionado en la Comisión Industrial, no permite dudar de su sanidad mental el día de autos, ni acoger racionalmente la noción de que al dar muerte a su víctima su deficiencia mental le impidiere comprender la criminalidad del acto; ni que le faltara capacidad para sujetar sus actos al mandato de ley. Esa capacidad se manifestó en el ejercicio de discreción selectiva (4) cuando revólver en mano apartó a la mujer para no hacerle daño mientras disparaba contra el joven sentado en el automóvil y en su reacción responsable al percatarse de que se había equivocado, llevando él mismo al herido al hospital. Que perdiera la paciencia con abogados maltra-tándoles, que fuere también áspero con el personal de la agencia donde trabajaba en su exigencia de corrección de los

---

(4)Se supone en el sujeto *capacidad volitiva* para querer el resultado punible. En la voluntad reside "el querer", y el querer se resuelve en poder *seleccionar*. Esta función está gobernada por el mecanismo de "inhibición" que representa un sistema de control de los instintos que impulsan a realizar actos independientes de la inteligencia. La inhibición es el vigilante insomne de la conducta. Miró Cardona, *Proyecto de Código Penal Puertorriqueño*, 41 Rev. Jur. U.P.R. págs. 425–6.

trabajos y que sus decisiones fueren revocadas por el Tribunal Supremo en 33-1/3 de las veces (y confirmadas en el restante 66-2/3) en ningún orden de razonamiento acusan la incompetencia mental que anula el conocimiento de la criminalidad del acto y convierte el actor en inimputable.

El estado eximente de locura excluye el arrebato de la pasión, sea cual fuere el desorden intelectual que produzca pues no cabe confundir sin grave quebrantamiento de la justicia y la moral, la situación del que tiene anuladas sus facultades mentales por causas extrañas a su voluntad con la del que se deja influir por estímulos que en su origen le es dado vencer, y que la razón puede y debe refrenar. Para la apreciación del estado de locura no basta la existencia de cualquier anomalía[5] o alteración de las facultades mentales o de excentricidades y conducta rara, siendo preciso que se declare probada la completa enajenación en el momento de ejecución del hecho procesable.

En el inevitablemente confuso campo de patología y de conducta sicopática en que se enfrentaron los peritos de la defensa y del Estado, hay un área de acercamiento entre ellos al reconocer en el acto criminoso del acusado una reacción esquizoide y paranoide que limita el discernimiento y nubla la conciencia del acto, sin que alcance el punto de eclipse total de la voluntad que no deja huella de razón, situación que aun cuando no exime de responsabilidad, atenúa su culpa y a tal grado vindica la corrección del fallo de convicción reduciendo el cargo en la acusación de asesinato en primer grado a homicidio voluntario. Sobre este extremo de imputabilidad aminorada se ha expresado el Tribunal Supremo de España con preclaros timbres de juridicidad:

"Si bien es cierto que está probado que el interesado es un

---

[5] El concepto de anormalidad síquica resulta inasible en el orden siquiátrico. Según afirman los que dedican sus afanes a los estudios de la siquiatría no existe un solo síntoma que no pueda encontrarse en sujetos que suelen considerarse como normales. Miró Cardona, *op. cit.*, pág. 426.

esquizofrénico que tiene disminuida, aunque no anulada, su lucidez mental, y conserva al cometer la malversación la suficiente para apreciar *grosso modo* su inmoralidad y punibilidad, no es posible olvidar que el vocablo 'enajenado', que emplea el precepto, se refiere, según doctrina jurisprudencial, al que en todo momento tiene perturbadas sus facultades mentales, y que entre la alienación y la completa normalidad de la mente existen estados o zonas intermedias que no determinan la absoluta irresponsabilidad del sujeto activo del delito, pero le colocan en un plano de imputabilidad aminorada; y como el recurrente al delinquir se encontraba afecto a un proceso psíquico que sin abolir ni perturbar gravemente su inteligencia y su voluntad, restringía su lucidez mental, no debe ser juzgado como un ser que goza de plena y sana razón, ni como el que ya ha traspasado los umbrales de la demencia, sino como individuo que tiene alterado el normal funcionamiento de sus facultades mentales, y no puede, por tanto, discernir como el que se halla en su cabal juicio la intensidad del mal que realiza, la trascendencia de sus actos y la ilicitud de los mismos; de acuerdo con este criterio, es correcta la apreciación de la atenuante." (Sentencia Núm. 635 de 8-5-1944, XI Rep. Jurisp. Aranzadi 363.)

■ En el universo siquiátrico donde las conclusiones tajantes son inconcebibles, infinitos los grados de limitación del discernimiento y del albedrío, e inasible por inconcluso el concepto de abolición total de la conciencia y de la voluntad que para apreciación de la eximente exige el Art. 30 del Código, el veredicto o el fallo judicial donde se promueva la defensa de locura no ha de estar aprisionado en la rígida alternativa de cordura o enajenación sino que en la más amplia valoración de la situación del acusado y dentro de la norma de duda razonable podrá el veredicto reflejar la imputabilidad aminorada o eximente incompleta que resulta en atenuante y cuando proceda, en reducción de la calificación original del delito. La convicción en tales circunstancias, por representar la atemperada responsabilidad, también tendría

equivalente efecto moderador en la sanción de la conducta delictiva. *Cf. Pueblo* v. *Belmonte Colón*, 106 D.P.R. 82 (1977).

◾ Cuando se plantea la defensa de locura, la capacidad mental del acusado es condición cuya determinación final corresponde al juzgador de hechos, bien sea juez o jurado. Estamos convalidando la apreciación de la prueba sobre enajenación mental por el juez en este caso en deferencia a su facultad estimativa, como hubiésemos dejado en pie un veredicto distinto de haber él estimado, al considerar toda la evidencia, que la cordura del apelante no estuvo intervenida por enfermedad mental incapacitante. *Confirmada.*

Los Jueces Asociados Señores Torres Rigual y Negrón García no intervinieron.