EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ LUIS MONTES VEGA, acusado y apelante.

*Número:* CR-84-25     *Resuelto:* 29 de diciembre de 1986

*José Enrique Ayoroa Santaliz,* abogado del apelante; *Rafael Ortiz Carrión, Procurador General* y *Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

José Luis Montes fue acusado por el delito de asesinato en primer grado por haber dado muerte a su esposa. De conformidad con la Regla 74 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, levantó la defensa de incapacidad mental.

Celebrado el juicio ante un jurado resultó convicto por lo que se le impuso una pena de noventa y nueve años de presidio.

En apoyo del recurso de apelación, el apelante sostiene que la totalidad de la prueba pericial demuestra que él "padece de un desorden de personalidad paranoide y refleja un deterioro marcado de su personalidad, y una pérdida de control de sus emociones y acciones; y que, ante la súbita confesión de inf[i]delidad que le hace su esposa, en detalle, se produce una explosión psicótica transitoria que no le permitió comprender la criminalidad de su acto, ni de conducirse según el mandato de la ley". Y en la alternativa, alega que "como mínimo, el cuadro general de los hechos de este caso, las coincidencias en las opiniones de los peritos de la Defensa y los del Estado, revelan una imputabilidad aminorada o una eximente incompleta en la conducta del Apelante José Luis Montes Vega, por lo que esta Honorable Superioridad, debe, en Justicia, reducir la convicción al cargo de homicidio voluntario".

En este caso desfiló abundante prueba testifical presentada por ambas partes. La misma fue sumamente detallada. No estuvo limitada a lo que ocurrió el día de los hechos. El jurado tuvo ante sí el historial del matrimonio del apelante y la occisa. Se le presentó prueba sobre todo lo que ocurrió inmediatamente antes y después del lamentable suceso.

El acusado presentó su versión sobre lo que aconteció, y lo que le motivó a matar a su esposa. El acusado y otros testigos declararon sobre sus movimientos después de los hechos. (¹) El apelante tuvo la oportunidad de presentar prueba pericial para establecer su defensa de impedimento por razón de enfermedad mental. El fiscal refutó la misma presentando a su vez prueba pericial. El jurado rindió un fallo de culpabilidad por el delito de asesinato en primer grado. No encontró la prueba del apelante creíble o suficiente para eximirlo de responsabilidad o rebajar el delito a homicidio voluntario.

El testimonio del doctor Cangiano, testigo del fiscal, es sumamente revelador. Fue el primer psicólogo en evaluar al apelante quince días (²) luego de ocurrir los hechos. Declaró cómo se desencadenó la tragedia:

Fiscal Goyco:

P. ¿Qué fue lo que le dijo, vamos a ver?

Testigo:

R. No, no, al otro día entonces él dice que va a ver la nena y entonces se encuentra con el suegro que le dice que se van a divorciar verdad, el suegro le dice la cuestión del divorcio y que no la viera más, no viera más a la joven. Y entonces, él le dice a la muchacha que fueran a dar una vuelta para ver el abogado.

---

(¹) Es de gran importancia que el acusado ocultó que había matado a su esposa. Habló con sus familiares y varios parientes de la occisa sin informar lo acontecido.

(²) Adviértase que al medir el peso y credibilidad del testimonio presentado para probar incapacidad mental al momento de ocurrir los hechos, el juzgador puede tomar en consideración el tiempo transcurrido entre la fecha en que se dictaminó su estado y la fecha en que ocurrieron los hechos. *Molina* v. *Jefe Penitenciaría,* 96 D.P.R. 191, 199 (1968). En *Pueblo* v. *Castillo Torres,* 107 D.P.R. 551, 556 (1978), se expresó: "mientras más temprano se lleve a cabo el examen más fácil será para los psiquiatras llegar a conclusiones científicas confiables sobre el estado mental del acusado".

En el presente caso uno de los dos peritos de la defensa evaluó al apelante tres meses después de ocurrido los hechos y el otro, seis meses más tarde.

P. ¿O sea, José Luis, le informa a usted que decidieron irse a ver un abogado?

R. ¡Ajá!

P. ¿Y qué pasó entonces?

R. Pues, entonces ahí es que en vez de irse al abogado, se van a otro lugar.

P. Le pregunto, ¿si le informó a usted, que fue a buscar un carro con aire acondicionado para buscar a su esposa?

R. No, ese dato así, no.

P. Ese dato no se lo dijo. ¿Y cómo alega él que ocurrieron estos hechos?

R. Bueno, él dice que cuando iban por el camino aparentemente él comienza a traerle la información ésta que él sabía, este . . . y que ella por el camino se arrepiente de los hechos, este . . . y entonces se meten en un sitio oculto, hablaron y tuvieron relaciones sexuales.

P. ¿Y tuvieron relaciones sexuales?

R. Sí. Entonces, que ella aceptó todos los hechos; que había tenido relaciones sexuales con ese muchacho, que había llorado en ese momento y entonces le informó que las relaciones sexuales habían sido en la playa, mientras estuvo con el padre, con el, el . . . aparentemente en una gira con el papá en la playa verdad y que estaba toda la familia.

P. ¿Eso se lo dijo, José Luis Montes Vega?

R. Sí. Y que tuvieron relaciones en el agua. Este . . . y que estas cosas ella se las decía llorando. Y que varias veces usaron la casa de ellos para tener relaciones sexuales.

P. ¿Eso dice, José Luis, y se lo contó a usted así?

R. Sí. Claro, esta información, él la d[a] llorando. O sea, este . . . bien angustiado. Entonces, él le informa que él le va a quitar a los niños y ella, pues reacciona; él dice que perdió el control y la estranguló. Y entonces que le dio mucho miedo y le hablaba como para que despertara. Entonces, que él no encontró qué hacer, la dejó en el piso y entonces sintió miedo de lo que había hecho y quería suicidarse. Entonces, había unas hojas cercanas y entonces empezó a comer hojas a ver si se envenenaba.

P. ¿Se envenenó, doctor?

R. No, no. Trató de buscar la llave del baúl y no la tenía y entonces sacó la base del asiento del carro, de atrás y . . . entonces la colocó en el baúl. Entonces, al rato buscó un risco

para tirarse con ella, pero que los riscos que habían no eran muy seguros, en términos de que no eran muy profundos . . . .

P. Perdón, ¿que los riscos no eran qué?

R. Muy profundos. En el sentido de que si él se tiraba podía quedar con vida, verdad. Y entonces, él se preocupaba que fuera a quedar con vida y ella estuviera muerta. Y entonces, siguió bebiendo, comenzó a beber. Este . . . esto era . . . él me habló de un sector La Pica. Se fue a casa de una tía, eso era en Ciales. Siguió bebiendo, se emborrachó y pensaba deshacerse de ella. Y entonces, la rodó por un barranco y empezó a correr por toda la isla. T.E., págs. 281–283.

■ Lo determinante, en casos como el de autos, es que el acusado carezca de capacidad suficiente para comprender la criminalidad del acto imputado o para conducirse de acuerdo con el mandato de ley, a causa de enfermedad o defecto mental, *al momento del hecho*. Además, aun establecido el hecho de que exista una enfermedad mental, corresponde determinar si dicha enfermedad o defecto mental impidió que el apelante comprendiera la criminalidad del acto imputado o que sujetara su conducta al mandato de ley.

■ Sobre el particular hemos expresado lo siguiente:

El Art. 30 del Código Penal, 33 L.P.R.A. sec. 3152, establece que no es imputable de delito aquel que al momento de los hechos, a causa de enfermedad o defecto mental, careciere de capacidad suficiente para comprender la criminalidad de sus actos o para conducirse de acuerdo al mandato de la ley. Esta disposición proviene de la Sec. 4.01 del Código Penal Modelo del Instituto Americano de Derecho (*Model Penal Code—American Law Institute*). En la nota explicativa a la misma se dispone:

"To be held irresponsible, the individual must, as a result of a mental disease or defect, either lack substantial capacity to appreciate the criminality [wrongfulness] of his conduct or lack substantial capacity to conform his conduct to legal requirements. The standard does not require a total lack of capacity, only that capacity be insubstantial. An individual's failure to appreciate the criminality

of his conduct may consist in a lack of awareness of what he is doing or a misapprehension of material circumstances, or a failure to apprehend the significance of his actions in some deeper sense. Wrongfulness is suggested as a possible alternative to criminality, though it is recognized that few cases are likely to arise in which the variation will be determinative. An individual is also not responsible if a mental disease or defect causes him to lack substantial capacity to conform his conduct to the requirements of the law. This part of the standard explicitly reaches volitional incapacities."

Surge de lo anterior que la determinación de inimputabilidad por razón de incapacidad mental puede ser el resultado de defectos en la capacidad de la persona, tanto a nivel cognoscitivo como volitivo. También resulta importante destacar que la carencia en la capacidad del imputado no tiene que ser total. Sólo es necesario demostrar que la persona no cuenta con capacidad suficiente para comprender la criminalidad de sus actos o de conformar éstos al mandato de la ley. Véase Neváres-Muñiz, *op. cit.*, págs. 235–245.

Con respecto a la capacidad mental del imputado, hemos resuelto que la ley presume la cordura de éste. Siendo así, el fiscal no está en la obligación de presentar prueba sobre su capacidad mental para delinquir. No obstante, de presentarse prueba suficiente que establezca duda razonable sobre la cordura del acusado al momento de los hechos, la mencionada presunción queda rebatida. La prueba a tales efectos puede ser presentada por el acusado o surgir de la ofrecida por el Pueblo para establecer su caso. Una vez rebatida la presunción de cordura, recae sobre el Ministerio Fiscal el peso de presentar prueba que demuestre más allá de duda razonable la capacidad mental del imputado al momento de los hechos. . . . La prueba requerida a estos fines es aquella que establezca en la conciencia del juzgador la certeza moral y firme convicción sobre su imputabilidad.

Es de rigor señalar que el mero hecho de que se presente prueba pericial para rebatir la presunción de sanidad mental no le impone de manera absoluta al Ministerio Fiscal la obligación de también ofrecer prueba pericial para refutar la de la defensa. Conocida es la regla que establece que el juzgador de hechos no está obligado a aceptar las conclusiones de un

perito. Es suficiente en derecho aquella prueba de cargo, sea o no pericial o una combinación de ambas, que demuestre más allá de duda razonable la cordura del acusado. La naturaleza y cantidad de la prueba que ha de presentar el Pueblo para contradecir la traída por la defensa para establecer la inimputabilidad, dependerá de la contundencia y robustez de esta última. (Citas y escolios omitidos.) *Pueblo* v. *Marcano Pérez*, 116 D.P.R. 917, 926–928 (1986).

■ Aplicados los principios normativos antes expuestos al presente recurso entendemos, que si bien es cierto que los peritos estuvieron de acuerdo en que el apelante, *al momento de su evaluación,*[3] padecía de un desorden de personalidad paranoide, esto no quiere decir que el apelante no comprendiera la criminalidad de su acto. El doctor Cangiano declaró lo siguiente:

> El eje dos, nos habla sobre el desorden de personalidad. O sea, un desorden de personalidad es un tipo de problema en el comportamiento, donde los razgos del comportamiento se alteran verdad, se afectan. Específicamente las relaciones con otras personas, en términos del autoimagen, pero que el individuo está totalmente orientado, sabe lo que está haciendo y reconoce la consecuencia de los actos, etcétera.
>
> P. Le pregunto, ¿si ese es el caso de, José Luis Montes Vega?
>
> R. Sí. O sea, el desorden de personalidad paranoide. T.E., pág. 287.

Por su parte, el doctor Font Llabrés perito del Estado, declaró que:

> R. Personalidad paranoide, significa que una persona es desconfiada. Y que piensa que si hay un grupo de gente van a intentar hacer algo en contra de él, o hacerlo quedar en ridículo, etcétera. Pero, eso no significa que la persona esté loca. T.E., pág. 340.

---

[3] El diagnóstico del psicólogo que evaluó al apelante, más próximo a los hechos, fue de reacción depresiva que consideró completamente normal y la atribuyó a un sentimiento de culpa.

Consideramos que los hechos en que se basa la defensa para sostener la inimputabilidad del acusado apelante fueron debidamente ponderados por el Jurado. Éste analizó la prueba presentada por ambas partes y dirimió las contradicciones entre los testigos concediéndole credibilidad a los testigos de cargo y convenciéndose de la sanidad mental (⁴) del apelante y de su culpabilidad más allá de duda razonable.

■ Por otro lado, hemos señalado anteriormente que:

El estado eximente de locura excluye el arrebato de la pasión, sea cual fuere el desorden intelectual que produzca pues no cabe confundir sin grave quebrantamiento de la justicia y la moral, la situación del que tiene anuladas sus facultades mentales por causas extrañas a su voluntad con la del que se deja influir por estímulos que en su origen le es dado vencer, y que la razón puede y debe refrenar. Para la apreciación del estado de locura no basta la existencia de cualquier anomalía o alteración de las facultades mentales o de excentricidades y conducta rara, siendo preciso que se declare probada la completa enajenación en el momento de ejecución del hecho procesable. *Pueblo* v. *López Rivera,* 109 D.P.R. 160, 165 (1979).

En el presente caso tampoco se trata de imputabilidad aminorada, como pretende el apelante al invocar el caso de *Pueblo* v. *López Rivera,* supra. En el caso de *Pueblo* v. *López Rivera,* supra, hubo un área de acercamiento entre los peritos del Pueblo y la defensa en cuanto a que el acto crimi-

---

(⁴) El día de los hechos el apelante cogió un automóvil prestado, porque el suyo no funcionaba bien y no tenía aire acondicionado. Luego que mató la víctima (en un lugar apartado), le dio mucho miedo y se dio "cuenta que todo estaba perdido", pensó tirarse por un barranco, pero no lo hizo "por temor de quedar vivo porque el barranco no era muy malo". (E.N.P., pág. 47.) El propio apelante declaró que dejó a la víctima en un sitio obscuro donde no hay alumbrado. Las personas que vieron al apelante poco después de los hechos declararon que estaba nervioso, pero que su comportamiento era normal, no notaron nada raro en él. Además, la alegada confesión de infidelidad de que habla el acusado sólo está sostenida por su propio testimonio.

noso del acusado respondía a una reacción esquizoide[5] y paranoide que limita el discernimiento y nubla la conciencia del acto. Ibíd., pág. 165. La apreciación del jurado, en el caso de autos, no fue en ese sentido. No hallamos razón alguna para intervenir con la valoración de la prueba por el juzgador[6] de los hechos. A pesar de que este Tribunal se encuentra en igual posición que el tribunal de instancia para evaluar la prueba pericial, y puede adoptar su propio criterio, no encontramos base alguna para variar dicha determinación. *Pueblo v. Rovira Ramos*, 116 D.P.R. 945 (1986).

"Recordemos la famosa frase de Alfredo Hoche, que dijo en Alemania, hace ya muchos años, que la fijación de las entidades nosológicas era en Psiquiatría 'la caza de un fantasma'."[7] Un paranoico puede haber obrado con conciencia plena y haber podido inhibir sus impulsos delictivos, y otro puede ejecutar hechos en que le fue imposible inhibir el impulso al crimen o conocer la criminalidad de su acto. Sólo frente al sujeto determinado podrá decidirlo el auténtico perito.

No se ha demostrado que el jurado, quien al dirimir el conflicto en la prueba pericial dio mayor peso probatorio a los peritos, y cuya evaluación sobre la cordura del apelante fue más próxima a los hechos, actuara con pasión, prejuicio o

---

[5] En este caso no hubo un diagnóstico de esquizofrenia. Uno de los peritos del Pueblo expresamente señaló que el apelante no estaba esquizofrénico.

[6] "Cuando se plantea la defensa de locura, la capacidad mental del acusado es condición cuya determinación final corresponde al juzgador de hechos, bien sea juez o jurado. Estamos convalidando la apreciación de la prueba sobre enajenación mental por el juez en este caso en deferencia a su facultad estimativa, como hubiésemos dejado en pie un veredicto distinto de haber él estimado, al considerar toda la evidencia, que la cordura del apelante no estuvo intervenida por enfermedad mental incapacitante." *Pueblo v. López Rivera*, 109 D.P.R. 160, 167 (1979).

[7] L. Jiménez de Asúa, *La ley y el delito: principios de derecho penal*, 13ra ed., Buenos Aires, Ed. Sudamericana, 1984, págs. 344-345.

parcialidad. *Pueblo* v. *Reyes Acevedo*, 100 D.P.R. 703, 711 (1972). Ni se demostró que lo hiciera al no darle crédito al testimonio del apelante. El juicio tuvo un desenlace justo y fundado.

*Se confirmará la sentencia apelada.*

Los Jueces Asociados Señores Negrón García y Rebollo López concurren en el resultado sin opinión escrita.