Sánchez Martínez, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
El apelante fue condenado por un robo y cuatro cargos de posesión y portación ilegal de armas de fuego. En apelación plantea que la identificación hecha por dos testigos oculares del asalto no fue confiable y (2) que el juzgador de los hechos cometió error al descartar la prueba de coartada que tendió a demostrar que el apelante no pudo haber cometido los hechos delictivos sin ser detectado por el sistema de supervisión electrónica (grillete) al que estaba sujeto. Resolvemos que no se infringió ninguna norma jurídica en el proceso de identificación del apelante, pero revocamos las condenas por concluir que la prueba de coartada presentada por el apelante en juicio era suficiente para crear una duda en la mente del juzgador de los hechos con respecto a su culpabilidad.
I
El señor José M. Reyes Santiago ("Reyes”) declaró que el 25 de febrero de 1994, alrededor de las 11:00 a.m., él se encontraba parado en la esquina del colmado propiedad de don Marcelino Rodríguez Santiago ("don Marcelino"). Mientras Reyes conversaba con don Marcelino, llegaron dos personas, el apelante Israel Medina Rodríguez y otra más. El apelante le pidió a don Marcelino una caja de cigarrillos pero le dijo que solamente tenía un dólar. Don Marcelino le ripostó que los cigarrillos costaban $1.25
El apelante y el otro asaltante se dirigieron hacia Reyes y le pidieron una peseta. Cuando Reyes le contestó que no tenía, ambos individuos le dijeron que se fuera porque si no le pegaban un tiro (Reyes declaró haber visto un revólver negro, calibre 38). Reyes se dirigió corriendo al edificio Gina Laura. El apelante y el otro asaltante entonces entraron al Colmado y le indicaron a don Marcelino que se trataba de un asalto. (Según la declaración posterior de don Marcelino, ambos asaltantes tenían un revólver.) Le ordenaron a don Marcelino que se tirase al piso pero éste se negó. El otro asaltante procedió a coger el menudo, mientras el apelante encañonaba a don Marcelino. Los asaltantes también se llevaron los otros cigarrillos del negocio. Le dijeron a don Marcelino que no saliera para afuera. Los asaltantes salieron corriendo hacia un terreno baldío en dirección al barrio Piedras Blancas de Ponce.
Don Marcelino llamó inmediatamente a la policía desde un teléfono público. Declaró haberle indicado a la Policía que los asaltantes tenían un "sweater" azul y mahones sucios. Los agentes salieron en su búsqueda. Don Marcelino declaró durante el juicio que el asalto duró de 3 a 5 minutos.
Alrededor de las 3:00 p.m. del mismo día del asalto, ambos testigos fueron a la Comandancia. Allí vieron un álbum o libro con más de cuarenta fotografías. Ambos identificaron a uno de los asaltantes en una fotografía. Don Marcelino declaró que identificó al más bajito de los asaltantes. La Policía les *1291 informó que el nombre de dicho asaltante era el del apelante Israel Medina Rodríguez. Sin embargo, no vieron la fotografía del otro asaltante entre las fotos que les mostraron.
Alrededor de entre las 5:00 y las 6:00 p.m. del mismo día, la Policía le informó a don Marcelino que habían capturado a uno de los asaltantes. El fue al tribunal y allí le presentaron al apelante.
Según el testimonio de don Marcelino, él prestó una declaración jurada ante el Fiscal José Iguina de la Rosa en la que ofreció las siguientes descripciones de los asaltantes:
”[U]no era más alto que el otro. El más alto tenía un rabito, y me encañonaba con un revólver mientras el otro cogía los chavos de la caja y la bolsa con el "petty cash", era un muchacho joven, era más blanco que el bajito, tenía un mahón, un "sweater" largo azul, era más flaco que el bajito. A ese no lo he podido identificar porque no he visto fotografías de él, pero si las veo lo identifico. El otro era más bajito que el otro, tenía un recorte reciente bastante pegado, tenía un "sweater" pero este "sweater" no tenía pintitas, colores o algo así como el otro "sweater" azul, ese era "plain", era un poco más gordito que el otro, pero más o menos ahí como el otro, tenía mahones azul claro."
Don Marcelino nunca dijo en esta declaración jurada ni en la declaración que brindó en la vista preliminar, que conociera a los dos asaltantes con anterioridad a los hechos en cuestión. De igual forma, el testigo Reyes nunca le dijo a la Policía que el apelante era el hijo de la señora que recogía latas de aluminio. Reyes declaró que sólo le dijo a la Policía que lo conocía.
Como resultado de los hechos descritos anteriormente, el apelante fue acusado por dos infracciones a cada uno de los Arts. 6 y 8 de la Ley de Armas, 25 L.P.R.A. sees. 416 y 418 (poseer y portar ilegalmente armas de fuego cargadas), y por infracción al Art. 173 del Código Penal, 33 L.P.R.A. see. 4279 (robo).
Durante el juicio, tanto Reyes como don Marcelino declararon que conocían al apelante desde antes del asalto. Aunque Reyes expresó que no conocía su nombre o su apodo, declaró que conocía al apelante desde un año antes del asalto porque lo había visto de compras en el negocio de don Marcelino y porque su familia vivía detrás de Piedras Blancas y su mamá recogía latas de aluminio por esa área. Describió al apelante como flaco, y más alto que el otro, pero qué desconocía su nombre o apodo. A preguntas del Juez, Reyes declaró que el día de los hechos sabía con quién estaba hablando (refiriéndose al apelante).
Por su parte, don Marcelino declaró conocer al apelante y lo señaló en sala. Indicó conocer a la mamá del apelante de vista por ésta recoger latas de aluminio cerca de su negocio. Señaló además que el apelante y el otro asaltante frecuentaban su negocio y que la última vez que había visto al apelante había sido la semana antes.
El último testigo de cargo lo fue el agente Jesús Ostolaza Marrero. Este indicó que él, junto a la mujer policía, Elsie Miranda fueron los primeros en llegar al negocio de don Marcelino a atender la querella recibida. Allí don Marcelino le informó que aunque no conocía a los asaltantes de nombre, los podía identificar si los veía. El agente testificó que don Marcelino también le indicó que uno de ellos era una persona que tenía un grillete electrónico, pero posteriormente aceptó que no estaba seguro de si había sido don Marcelino quien le había dicho esto.
Declaró el agente Ostolaza sobre la identificación que hicieron Reyes y don Marcelino del apelante en la Comandancia al ver su foto. Luego la Policía encontró a la persona con el grillete, que resultó ser el apelante Israel Medina Rodríguez, y corroboró que tenía un sistema electrónico de supervisión. El apelante no quiso abandonar su casa hasta que no llamaran al oficial socio-penal que lo supervisaba entonces y el agente Ostoloza procedió a llamar al señor Samuel Saavedra. Al rato, llegó el señor Saavedra acompañado por la señora Vélez, del Programa de Supervisión Electrónica, y verificaron el equipo. El resto de la declaración del agente versa sobre la prueba que se hizo del equipo, la cual consistió en caminar desde la casa del apelante al negocio de don Marcelino de manera que se verificara si el sistema funcionaba y si éste emitía un sonido de alarma al registrar la salida fuera del perímetro permitido, ya que el negocio de don Marcelino estaba ubicado fuera de ese perímetro.
*1292 La prueba sobre la defensa de coartada consistió de un solo testigo, el oficial socio-penal de la Administración de Corrección, Samuel Saavedra. Su testimonio giró en torno a sus conocimientos sobre el sistema del grillete electrónico, su funcionamiento y un relato de todo lo que registró el grillete del apelante entre los días 21 y 25 de febrero de 1994.
Saavedra declaró que recibió adiestramiento y seminarios para supervisar el sistema de grilletes electrónicos. El tenía a su cargo la supervisión del apelante para la fecha en que ocurrieron los hechos de este caso. Declaró sobre el informe de computadora que se admitió en evidencia el cual contiene un resumen diario de las incidencias de la supervisión incluyendo los movimientos del supervisado (el apelante) fuera del perímetro. Saavedra declaró que de acuerdo con el reporte, para el período del 21 al 25 de febrero de 1994 (siendo este último día el día de los hechos), el apelante salió del perímetro en tres ocasiones únicamente, a saber, una vez cada uno de los días 21, 22 y 23. De estas tres salidas solamente la del 21 no estuvo autorizada. El sistema no detectó ninguna salida del perímetro para los días 24 y 25 (día de los hechos).
Respecto al día 25, el señor Saavedra declaró que del resumen diario rendido por la computadora surge que el sistema hizo una llamada a la unidad del apelante a las 4:26 de la madrugada y encontró que el equipo estaba funcionando normalmente. Al testigo lo llamaron a la oficina y él se personó a la casa del apelante. Cuando llegó al lugar, los agentes de la Policía le explicaron lo que había sucedido en relación con el robo.
Para verificar el equipo electrónico que monitorea el grillete que tenía el apelante, el señor Saavedra decidió desconectarlo de la corriente eléctrica (explicó que aún cuando falte la electricidad la máquina continúa funcionando con pilas de resguardo). Al desconectar la electricidad se reflejó en el informe diario que a las 4:42 de la tarde hubo un fallo de energía eléctrica (power fail AC line).
En adición a eso, el testigo le pidió a los agentes de la Policía que caminaran con el apelante en dirección al negocio en el que supuestamente había ocurrido el asalto para verificar si el equipo emitía la señal de alarma indicativa de que el apelante estaba abandonando el perímetro designado. Aclaró que el equipo emite una señal en forma de chicharra para indicar que la persona está fuera de su perímetro.
En el caso del apelante, mientras el agente llevaba al acusado fuera del perímetro la máquina emitió el sonido avisando que el supervisado había traspasado el límite permitido. Cuando sonó la alarma aun no habían llegado al lugar de los hechos. Entonces le hicieron señas al policía para que regresara con el apelante. Esa prueba fue reportada por el sistema en el resumen diario como que ocurrió a las 4:42 p.m. y fue anotada en la columna de "Alert #" con el número 1048718.
El testigo declaró también que luego de realizar la prueba con el apelante, él conectó nuevamente la energía eléctrica de la máquina, lo cual fue igualmente detectado y reportado en el informe diario a las 4:51 con la anotación power restored AC. A las 10:46 p.m. él recogió y desconectó el equipo de la casa del apelante y eso se reportó en el informe diario como Missed called late con el número 1044933 en la columna "Alert#".
El contrainterrogatorio del fiscal estuvo más bien dirigido a determinar si el sistema podía ser alterado para ampliar el perímetro de confinamiento de 200 a 300 pies, si era afectado por las condiciones atmosféricas y si el propio sistema concedía un período de gracia de seis minutos antes de activar el mensaje de alarma. El testigo rehusó contestar estas preguntas por razones de seguridad. La exposición narrativa de la prueba nada indica sobre si el tribunal a quo indagó acerca de la legitimidad de tal reclamo de parte del funcionario.
Habiendo quedado sometido el caso para ser fallado, el ilustrado juez sentenciador expresó que no le daba ninguna credibilidad a la máquina que monitoreaba a las personas que están bajo el programa de supervisión electrónica y encontró culpable al apelante. El tribunal lo sentenció en grado de reincidencia a cumplir los siguientes términos de reclusión: doce años por el robo; cinco años por cada infracción al Art. 8 de la Ley de Armas; y tres años por cada infracción al Art. 6 de la Ley de Armas. Estas penas fueron impuestas de forma concurrente entre sí pero consecutivas con cualquiera otra que hubiere estado cumpliendo con anterioridad.
*1293 II
El apelante plantea como único error en su alegato que no se probó la culpabilidad del apelante fuera de duda razonable pero en la discusión de este señalamiento son fácilmente identificables al menos dos fundamentos distintos, a saber: (1) que la identificación del apelante como autor de los hechos no era confiable y (2) que la prueba de su defensa de coartada era suficiente para establecer la duda razonable que justificaba la absolución en los méritos. 
Este caso, distinto a lo que asevera el apelante, no presenta un problema procesal de identificación. Ambos testigos aun cuando no conocían al acusado por su nombre, alegaron que sí lo conocían de vista. En Pueblo v. García Reyes, 113 D.P.R. 843 (1983), el Tribunal sostuvo que si el perjudicado conociere al acusado con anterioridad a los hechos delictivos, tal circunstancia hace inaplicables "las salvaguardas que requiere la Constitución para la confiabilidad y, por ende, validez de la identificación extrajudicial". Id. a la pág. 848. Véanse, además, Pueblo v. Mattei Torres, 121 D.P.R. 600, 608 (1988), y Pueblo v. Lebrón González, 113 D.P.R. 81, 99 (1982). La prueba desfilada en el juicio tendió a demostrar que los dos testigos oculares conocían de antemano al acusado quien vivía cerca del lugar de los hechos y sabían que éste era hijo de la señora que recogía latas por el vecindario. Esta prueba debió haber sido suficiente para estimar probada la culpabilidad del apelante fuera de duda razonable, de no haber sido por lo que discutimos a continuación en relación con el segundo señalamiento de error. El segundo apuntamiento de error se refiere a que el tribunal sentenciador descartó indebidamente la prueba de coartada presentada en este caso. Como hemos dicho, esta prueba consistió en el testimonio del señor Saavedra, quien era el oficial socio-penal de la Administración de Corrección a cargo de la supervisión del apelante en el Programa de Supervisión Electrónica en Ponce.
En esta jurisdicción "[l]a prueba de coartada no tiene que establecer, fuera de duda razonable[,] que era imposible que el apelante hubiese cometido el delito. La coartada no tiene que probarse más allá de duda razonable. Sólo constituye prueba que tiende a establecer que el acusado no cometió el delito o a crear una duda en la mente del jurado con respecto a su culpabilidad". Pueblo v. Moreu Pérez, 96 D.P.R. 60 (1968). Hemos visto que en el caso de autos, el apelante presentó prueba contundente de coartada que no fue impugnada de modo alguno por el Ministerio Público .
Es cierto que el tribunal no viene obligado a darle crédito a la defensa de coartada presentada por el acusado por este sólo hecho. Pueblo v. Acosta Acosta, 107 D.P.R. 68 (1978). Pero es igualmente cierto que si la prueba de coartada del acusado es robusta y convincente, el Ministerio Público no puede cruzarse de brazos y simplemente argumentar que se trata de una cuestión de credibilidad. Y éste es uno de esos casos.
En Pueblo v. Vélez Feliciano, 100 D.P.R. 813 (1972), el acusado fue convicto por tribunal de derecho por haberle vendido drogas a un agente encubierto de la Policía en dos fechas distintas. El acusado presentó en el juicio como prueba de coartada las nóminas de su patrono donde estaba evidenciado que para las fechas y horas en que el testigo decía haberle comprado la droga al apelante, éste se encontraba trabajando. También declaró el gerente de nóminas de la empresa. Sobre el particular el Tribunal Supremo expresó:

"...Dicha prueba documental fue preparada por un tercero ajeno a este caso —el patrono del apelante— en el curso normal de sus operaciones, como mes y medio antes de que el apelante fuese acusado de los delitos que se le imputan. Dicha prueba documental fue debidamente identificada por el oficial a cargo de la misma y no hay motivo alguno para sospechar que se trata de prueba fabricada."

Lo menos que puede decirse es que la prueba de defensa debió plantear y plantea suficientemente un problema de duda razonable. Tal parece que el tribunal de [primera] instancia descartó el valor probatorio de la mencionada prueba documental porque el fiscal le preguntó al testigo Giberson [gerente de nóminas] si era posible que existiese algún entendido entre un capataz y un empleado para que éste cobrase sin haber ido a trabajar, y Giberson contestó "puede ser". Desde luego, la mera posibilidad de que se haga tal cosa no demuestra que se hizo, ni siquiera que es probable que se haya hecho. Para demostrar lo falaz de ese pensamiento basta indicar que es posible que un millón de personas adultas en el país cometan un delito grave cada una en el día de hoy, sin embargo, esa *1294 mera posibilidad no justifica que se concluya que eso ha ocurrido. Aunque es posible, no es ni siquiera probable que ocurra. Por el contrario, en relación con la prueba documental presentada la presunción que ordena la Ley de Evidencia es que las transacciones privadas fueron realizadas con rectitud y en debida forma, a menos que se pruebe lo contrario. 32 L.P.R.A. see. 1887 (19). No hubo prueba alguna contraria en ese sentido." Id., a la pág. 816-17.
En el caso de autos la prueba de coartada la ha provisto el propio Estado con la tecnología que rutinariamente considera de fiar para conocer en todo momento el paradero de los convictos acogidos al Programa de Supervisión Electrónica que están bajo su custodia. No se trata, pues, del usual conflicto de prueba testifical en la que el juicio insustituible del juzgador de los hechos, al apreciar la prueba de comportamiento y conducta (demeanor) de los testigos, determina cómo probablemente ocurrió el evento delictivo. La comprobada permanencia del apelante en el espacio vital designado por el propio Estado para su estancia, bajo la continuada vigilancia de éste, no es cuestión que pueda descartarse livianamente.
El Pueblo arguye que el juez sentenciador "expresó al final del juicio que no le daba ninguna credibilidad a la máquina que monitorea a las personas que están bajo el programa de supervisión electrónica" y que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, este Tribunal no debe intervenir con la apreciación que de la prueba hizo el juzgador de los hechos. Pero el asunto no es así de sencillo. 
Lo que el ilustrado foro de primera instancia denomina como falta de "credibilidad de la máquina" —lo cual aparece enunciado como una regla de aplicación general a todos los casos— podría proyectar la impresión de ser un juicio previo que éste tiene sobre la falta de confianza en la tecnología de la supervisión electrónica empleada por el Estado para la vigilancia del apelante que no está sostenida por la prueba presentada.
Aparte de lo relativo a la imperturbabilidad de los hechos apreciados por el tribunal a quo, el alegato de El Pueblo nada argumenta sobre la prueba de coartada. Es un hecho irrefutable que el apelante tenía un grillete electrónico adscrito a un sistema de vigilancia capaz de detectar y registrar sus salidas fuera del perímetro de confinamiento definido por el sistema. El experimento llevado a cabo por el señor Saavedra permitió constatar que el sistema podía registrar electrónicamente el desplazamiento del apelante desde el perímetro de confinamiento hasta el lugar de los hechos. También quedó demostrado que el sistema podía detectar cualquier mal funcionamiento del equipo debido a fallas de energía eléctrica y que el día de los hechos el mismo estaba funcionando apropiadamente.
De este modo, es forzoso concluir que la prueba de defensa, no contradicha por el gobierno, tendió a establecer que el sistema de supervisión electrónica tenía la capacidad para detectar la ausencia del apelante del perímetro de confinamiento de ésta haber ocurrido en la fecha y hora que aseguran los testigos oculares haber visto al apelante cometiendo el asalto por el que fue declarado culpable. Ante prueba tan robusta y convincente, el Ministerio Público no podía permanecer impávido. Tenía que presentar prueba que estableciera afirmativamente y fuera de duda razonable que el sistema utilizado con el apelante no funcionaba apropiadamente o que de algún modo el mismo fue burlado o saboteado.
Aun cuando el acusado no tiene que probar su defensa de coartada fuera de duda razonable en este caso lo hizo. El apelante podía descansar en la confiabilidad que el propio Estado le atribuye al sistema de supervisión electrónica. Se trata de la misma prueba que habría sido suficiente para que el Estado pudiera revocar la libertad supervisada del apelante por aquél haberse ausentado del perímetro sin autorización el 21 de febrero de 1994, según lo demuestra el mismo informe admitido como exhibit 1 de El Pueblo.
El Ministerio Público estaba en la obligación de refutar el informe de la Administración de Corrección que concluía preponderantemente que el apelante jamás abandonó su perímetro durante el día y la hora en que ocurrieron los hechos de este caso. Debió igualmente presentar prueba para establecer cualquier dato que demostrara la falibilidad del sistema si es que esa era su teoría. Las preguntas de su contrainterrogatorio, por más inteligentes que parezcan, no pasan de ser pura *1295 especulación sin respaldo en la prueba presentada. Tampoco podemos pasar por alto que la defensa de coartada fue anunciada en debida forma nueve meses antes del juicio y que, incluso, el Ministerio Público solicitó una suspensión del juicio precisamente para investigarla. Véase minuta del 19 de agosto de 1994.
La norma que autoriza al tribunal de primera instancia a descartar la prueba pericial, Pueblo v. Montes Vega, 118 D.P.R. 164, 170-71 (1986), no opera en el vacío. Refiriéndose a la defensa de inimputabilidad, el Tribunal Supremo expresó en Pueblo v. Marcano Pérez, 116 D.P.R. 917 (1986), que si bien es cierto que el Ministerio Público no está obligado a presentar prueba pericial de cordura para rebatir la prueba de insanidad mental aportada por el acusado, también es cierto que "[l]a naturaleza y cantidad de la prueba que ha de presentar el Pueblo para contradecir la traída por la defensa para establecer la inimputabilidad, dependerá de la contundencia y robustez de esta última". Id., a la pág. 928 (énfasis nuestro). El mismo razonamiento debe ser aplicado, por analogía, a los hechos de este caso. Repetimos que, si la prueba de coartada del acusado es robusta y convincente, como lo fue en este caso, el Ministerio Público no podía cruzarse de brazos y simplemente argumentar ahora que se trata de una cuestión de credibilidad.
Somos conscientes de que el testimonio de los únicos dos testigos oculares coinciden en identificar al apelante como el autor de los hechos y que no existe en los autos del caso ninguna prueba que indique cualquier motivación malsana de parte de Reyes o de don Marcelino para querer perjudicar al apelante. Pero, a nuestro juicio, la culpabilidad de éste no puede hacerse depender de la existencia de tal prueba. Lo cierto es que la Constitución no le exige al acusado probar su defensa de coartada fuera de duda razonable, sino a la inversa. Es El Pueblo quien tiene que demostrar que la prueba de coartada aducida por el acusado no es digna de crédito para cuestionar la razonabilidad de la creencia en su culpabilidad.
No creemos que El Pueblo ha satisfecho el estándar probatorio para establecer la culpabilidad del apelante fuera de duda razonable. Lo contrario es cierto. La prueba de coartada presentada por el apelante en juicio era suficiente para "crear una duda en la mente del juzgador de los hechos con respecto a su culpabilidad". Pueblo v. Moreu Pérez, supra. Las condenas deben ser revocadas.
Con estos antecedentes, se revocan las sentencias apeladas y se decreta la absolución del apelante.
Lo acordó el Tribunal y lo certifica la señora Secretaria General.
María de la C. González Cruz
Secretaria General
ESCOLIOS 95 DTA 327
1. De las propias acusaciones se desprende que el apelante estaba cumpliendo sentencias por los delitos de robo e infracciones a los Arts. 6 y 8 de la Ley de Armas.
2. En su escrito de apelación, el apelante originalmente hizo tres señalamientos: (1) error del tribunal en la apreciación de la prueba; (2) error del tribunal al descartar la prueba de coartada; y (3) error del tribunal al llamar nuevamente a testificar a don Marcelino luego de que las partes hubiesen sometido el caso. Aunque este tercer apuntamiento es igualmente discutido en el alegato no lo habremos de discutir pues es patentemente frívolo.
3. Por eso no son de aplicación al caso de autos el procedimiento dispuesto por la Regla 252 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R.252, relativas a la identificación de sospechosos. Esta regla, sin embargo, se refiere al modo de llevar a cabo el procedimiento de identificación de sospechosos pero no establece cuándo es necesario efectuar el procedimiento. Sobre el particular el Tribunal Supremo tiene resuelto que esta regla es "un instrumento en reserva para usarse cuando la confusión, el correr del tiempo, la difícil percepción, el recuerdo tenue, la inseguridad del testigo, o cualquiera otro factor en evaluación lógica enerve la razonable certeza exigida de quien señala al autor del delito". Pueblo v. Suárez Sánchez, 103 D.P.R. 10, 19 (1974).
*1296 4. Dicho sea de paso, se trata de un programa sobre el cual el Gobierno, para que nuestra comunidad se sienta tranquila, le hace representaciones de que se trata de un mecanismo confiable de supervisión que por su avanzada tecnología le permite a la Administración de Corrección saber el paradero de sus supervisados en todo momento. También suponemos que éste habrá de ser el argumento del Gobierno cuando tenga que revocar los privilegios de libertad supervisada electrónicamente a base de que el liberado abandonó el perímetro definido, según detectado por el sistema.
5. En lo que respecta a la prueba pericial (como fue el testimonio relativo al sistema de supervisión electrónica), nosotros podemos evaluar dicha prueba con el mismo criterio de justipreciación que si fuéramos un tribunal de primera instancia. Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 450 (1985); Zambrana v. Santo Asilo de Damas, 109 D.P.R. 517, 522(1980).
6. Es curioso notar que una de las preguntas del contrainterrogatorio estaban dirigidas a establecer que el sistema provee un período de gracia de seis minutos antes de que el sistema registre que el supervisado ha rebasado el perímetro. Pero, primero, el testigo no contestó la pregunta y El Pueblo no adujo prueba independiente para establecer ese hecho. Segundo, por el modo en que ocurrieron los hechos de este caso, según los testigos, no estamos convencidos de que dicho asalto hubiera podido ser cometido en escasamente seis minutos. Y. tercero, no debemos olvidar que el experimento que llevó a cabo el señor Saavedra el día y en el lugar de los hechor demostró fehacientemente que el sistema detectó el abandono del perímetro cuando el apelante y el policía se dirigían hacia el lugar de los hechos, antes de llegar al mismo.