Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| WTT, SE, INC.; CONSULTING CPA GROUP, INC.; INFORMATION SYSTEMS STRATEGIES & ASSOCIATES, INC; TORRES & SOTO CPA, P.S.C.; TORRES HERNÁNDEZ & PUNTER, CPA, P.S.C.  APELADOS  v  **UNIVERSAL INSURANCE COMPANY**; ABC ADJUSTER, XYZ CORP; JANE DOE; JOHN DOE  APELANTE | TA2025AP00027 | *Apelación acogida como Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina  Caso Núm. CA2019CV03670  Sobre: Seguros-Incumplimiento Aseguradoras Huracanes Irma/María |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, y el Juez Marrero Guerrero.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de octubre de 2025.

### I.

El 20 de junio de 2025, Universal Insurance Company (Universal o parte apelante) presentó un recurso de *Apelación* en el que solicitó que revoquemos la *Sentencia* emitida el 20 de mayo de 2025, notificada al próximo día, por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI o foro primario).[2] En el referido dictamen, el TPI resolvió que Universal incurrió en incumplimiento de contrato al no pagar a WTT, SE, Inc. (WTT),

---

[1] Véase Orden Administrativa OATA-2021-086 del 4 de noviembre de 2021.
[2] Véase Entrada Núm. 1 del recurso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA).

Consulting CPA Group, Inc. (CCG), Information Systems Strategies & Associates, Inc. (ISSA), Torres & Soto CPA, P.S.C. (T&S) y Torres, Hernández & Punter, CPA, P.S.C, (THP) (en conjunto, la parte apelada), por la pérdida de ingresos que tuvieron a consecuencia del daño sufrido por el huracán María.[3]

El mismo 20 de junio de 2025, la parte apelante instó una *Moción al amparo de las Reglas 19 y 76 del Reglamento de este Honorable Tribunal solicitando autorización para presentar Transcripción de la Prueba Oral.*[4] Por medio de esta, solicitó que autorizáramos la presentación de la transcripción de la prueba oral (TPO) del juicio en su fondo, toda vez que dos de los errores esgrimidos versan sobre la apreciación de la prueba.

El 30 de junio de 2025, notificada el 2 de julio de 2025, emitimos una *Resolución* en la que concedimos a Universal hasta el 4 de agosto de 2025 para presentar la transcripción estipulada de la prueba oral desfilada ante el TPI.[5]

El 21 de julio de 2025, la parte apelada instó una *Moción asumiendo representación legal y Moción informativa en solicitud de prórroga a tenor con la R. 22 del Reglamento de este Honorable Tribunal* en la que anunció su representación legal y solicitó que el término para presentar su alegato comenzara a transcurrir a partir de la presentación de la TPO.[6]

El 22 de julio de 2025, emitimos *Resolución* en la que aceptamos la representación legal anunciada y precisamos que el trámite procesal siguiente se calendarizaría luego de la presentación de la TPO estipulada.[7]

---

[3] Véase Entrada Núm. 156 del expediente digital del caso en SUMAC del Tribunal de Primera Instancia (SUMAC-TPI).
[4] Véase Entrada Núm. 2 del recurso en SUMAC-TA.
[5] Íd., entrada Núm. 3.
[6] Íd., entrada Núm. 4.
[7] Íd., entrada Núm. 5.

El 4 de agosto de 2025, Universal presentó una *Moción sometiendo Transcripción de la Prueba Oral,* acompañada por la TPO estipulada.[8]

El 5 de agosto de 2025, emitimos una *Resolución* en la acogimos la TPO estipulada.[9] Además, concedimos a la parte apelante hasta el 4 de septiembre de 2025, para presentar su alegato suplementario. Por último, dispusimos que, una vez presentado este último, la parte apelada contaría con un término de treinta (30) días para presentar su alegato.

El 4 de septiembre de 2025, Universal presentó su *Alegato Suplementario.*[10]

Junto al alegato, presentó una *Solicitud bajo la Regla 70(D) del Reglamento del Tribunal de Apelaciones para presentar alegato suplementario en exceso del límite de páginas* en la que solicitó que autorizáramos la presentación del escrito en exceso del límite de páginas establecido en la Regla 16(D) del Reglamento del Tribunal de Apelaciones, según enmendada, **In re Aprob. Enmdas. Reglamento TA**, 2025 TSPR 42, pág. 31, 215 DPR ___ (2025).[11]

El 5 de septiembre de 2025, emitimos *Resolución* en la que autorizamos la presentación en exceso de páginas del alegato suplementario de Universal, y concedimos a la parte apelada hasta el 6 de octubre de 2025 para presentar su alegato en oposición.[12]

El 6 de octubre de 2025, la parte apelada radicó una *Oposición a Apelación y a Alegato Suplementario* en el que solicitó que confirmemos el dictamen apelado.[13]

La parte apelada también acompañó su alegato con una *Moción solicitando permiso para presentar oposición a Apelación a*

---

[8] Íd., entrada Núm. 6.
[9] Íd., entrada Núm. 7.
[10] Íd., entrada Núm. 8.
[11] Íd., entrada Núm. 9.
[12] Íd., entrada Núm. 10.
[13] Íd., entrada Núm. 11.

*tenor con la Regla 70(D) de este Tribunal* en la que solicitó que autorizáramos la presentación en exceso del límite reglamentario de páginas.[14]

El 7 de octubre de 2025, notificada al próximo día, emitimos una *Resolución* en la que autorizamos la presentación del alegato de la parte apelada en exceso de páginas.[15]

Contando con la comparecencia de ambas partes, damos por perfeccionado el recurso de *Apelación*. En adelante, pormenorizamos los hechos procesales esenciales para la atención del recurso.

**II.**

El caso de marras tuvo su génesis el 18 de septiembre de 2019, cuando WTT presentó una *Demanda* contra Universal por incumplimiento de contrato, daños y perjuicios y mala fe al amparo del derogado Código Civil de 1930, 31 LPRA ant. sec. 2 *et seq.*, y el Código de Seguros de Puerto Rico, según enmendado, 26 LPRA sec. 101 *et seq.*[16] En esta, alegó que el 1 de marzo de 2017, Universal expidió la póliza de seguros núm. 09-560-000542855-0/000 (Póliza) a favor de WTT.[17] Precisó que la Póliza incluía varias cubiertas que aseguraban la propiedad en caso de pérdidas o daños, incluyendo un seguro contra interrupción de negocios, con cobertura para asegurar los ingresos del negocio y los gastos adicionales incurridos para generar ingresos.

Arguyó que tras el paso del huracán María por Puerto Rico, la propiedad asegurada sufrió daños y pérdidas, los cuales causaron la suspensión de las operaciones y, consecuentemente, ocasionaron

---

[14] Íd., entrada Núm. 12.
[15] Íd., entrada Núm. 13.
[16] Véase Entrada Núm. 1 en SUMAC-TPI. Cabe señalar que las causas de acción incoadas al amparo del Código de Seguros, *supra*, fueron desestimadas por un Panel hermano de este Tribunal de Apelaciones mediante una *Sentencia* emitida el 30 de octubre de 2020, en el caso con designación alfanumérica KLCE202000860. Véase Entrada Núm. 50 en SUMAC-TPI.
[17] Conforme surge del expediente, la Póliza aseguraba una propiedad ubicada en el Municipio de Carolina. Véase Anejos 1 y 2 de la Entrada Núm. 87 en SUMAC-TPI.

una pérdida real de ingresos durante el tiempo necesario para la restauración del negocio.

Ante ello, adujo que, en octubre de 2017, notificó un aviso de pérdida catastrófica a Universal, el cual recibió el número de reclamación 1970618. Añadió que posteriormente, en agosto de 2018, presentó una reclamación detallada y fundamentada sobre los daños y las pérdidas sufridas.

No obstante, señaló que Universal incumplió con los términos de la Póliza, pues, entre otras razones: (1) actuó negligentemente y de mala fe en el proceso de ajuste; (2) realizó una investigación insuficiente y deficiente de los daños sufridos por la propiedad; (3) se negó a cubrir los daños ocasionados por el huracán María y, (4) retrasó el pago de la reclamación.

Añadió que los actos y omisiones de Universal le ocasionaron daños adicionales que se estimaban en no menos de $150,000.00.

Por lo anterior, WTT solicitó al TPI, entre otros: (1) que le ordenara a Universal el pago de $353,608.11 por concepto de las pérdidas ocasionadas por la interrupción de negocios y gastos adicionales; (2) una suma no menor de $150,000.00 por concepto de daños y perjuicios y, (3) las costas, gastos y honorarios de abogado por temeridad.

El 16 de marzo de 2020, Universal instó una *Contestación a la Demanda.*[18] De entrada, aclaró que el aviso de pérdida presentado por WTT en octubre de 2017 estaba relacionado a otro contrato de seguros, y no a la Póliza objeto de controversia. En ese contexto, precisó que el aviso de pérdida relacionado a la Póliza fue presentado el 22 de febrero de 2018, y se le asignó el número de reclamación 2008799. Arguyó que luego de realizar los trámites

---

[18] Véase Entrada Núm. 11 en SUMAC-TPI.

correspondientes, realizó una oferta de pago final a WTT, la cual fue aceptada parcialmente.

De otra parte, arguyo que WTT no acreditó ni evidenció sus alegadas pérdidas oportunamente, por lo que no se le debía imputar el tiempo que tomó el proceso de ajuste. Adujo también que las pérdidas alegadas por WTT eran excesivas, especulativas e inciertas, y no guardaban relación con los daños causados por el huracán María, por lo que estaban excluidas de la Póliza. En ese sentido, sostuvo que su ajuste fue razonable y el pago final ofrecido fue conforme a los términos y las condiciones de la Póliza.

Por último, esgrimió que WTT no desglosó los daños reclamados, por lo que estos debían entenderse renunciados.

Tras varias incidencias procesales, el 15 de julio de 2020, WTT presentó una *Moción solicitando autorización para presentar demanda enmendada*, en la que solicitó al TPI que le permitiera enmendar la demanda, a los fines de corregir el número de la reclamación relacionada a la Póliza e incluir hechos adicionales para sustentar dicha alegación.[19]

Al próximo día, el foro primario emitió y notificó una *Orden* en la que autorizó la presentación de la demanda enmendada.[20]

El 2 de septiembre de 2020, WTT presentó su *Demanda Enmendada*.[21] En esta, aclaró que en febrero de 2018 notificó un aviso de pérdida a Universal por las pérdidas por interrupción de negocios a consecuencia del paso del huracán María, y a dicha reclamación se le asignó el número 2008799/1. Añadió que el 27 de diciembre de 2019, Universal le cursó una oferta menor a la cantidad reclamada y evidenciada, sin incluir explicación alguna del ajuste ni evidencia que lo justificara, por lo que fue denegada.

---

[19] Íd., entrada Núm. 23.
[20] Íd., entrada Núm. 24.
[21] Íd., entrada Núm. 37.

El 17 de septiembre de 2020, Universal incoó una *Contestación a Demanda Enmendada.*[22] En cuanto a las alegaciones enmendadas, alegó afirmativamente que recibió una carta el 22 de febrero de 2018, en la que una firma de ajustadores públicos le informó que había sido contratada por WTT para atender asuntos relacionados a alegados daños ocasionados por el huracán María a varias propiedades cubiertas por la Póliza y otro contrato de seguros. Arguyó que dicha carta no especificaba reclamo alguno por pérdidas por interrupción de negocios, ni incluía pérdidas sobre ellas.

Añadió que WTT incumplió con su deber de notificar los documentos correspondientes, por lo que el 22 de mayo de 2018 envió una carta de cierre e informó que todas las reclamaciones a Universal se continuarían tramitando bajo la reclamación número 2008799. De otra parte, como defensa afirmativa, esgrimió que había compensado a WTT en su totalidad por las pérdidas reclamadas a causa del huracán María, por lo que su obligación había quedado extinguida.

Posteriormente, el 28 de febrero de 2023, el TPI emitió una *Orden de señalamiento y manejo de vista en su fondo mediante videoconferencia* en la que pautó el juicio en su fondo para los días 10, 11, 12, 13 y 14 de julio de 2023, a través de videoconferencia.[23]

De acuerdo a la Minuta del primer día de juicio, el TPI instó a que los peritos de las partes se reunieran e intentaran llegar a un acuerdo. Tanto Universal como WTT estuvieron de acuerdo, por lo que el CPA José E. Mendoza Rivera (CPA Mendoza Rivera), perito de WTT, y la CPA Iris M. Rivera Menéndez (CPA Rivera Menéndez), perito de la parte apelante, se reunieron durante los días 10 y 11 de julio de 2025.

---

[22] Íd., entrada Núm. 43.
[23] Íd., entrada Núm. 83.

Sin embargo, el 12 de julio de 2025, las partes informaron al tribunal que no lograron llegar a un acuerdo. De modo que, procedía dar comienzo al juicio. No obstante, previo a comenzar con el desfile de prueba, el representante legal de Universal, licenciado Luis R. Ramos Cartagena (licenciado Ramos Cartagena), solicitó al Tribunal que solo se admitiera en evidencia la prueba relacionada a la interrupción de negocio de WTT. Arguyó que la prueba anunciada –en específico, el informe pericial del CPA Mendoza Rivera–, incluía pérdidas de otras personas jurídicas que no eran parte en el caso, y pretender enmendar las alegaciones de la demanda con dicha prueba, para solicitar compensación económica de entidades que no eran demandantes, generaba un problema de legitimación activa y prescripción.

Añadió que no procedía aplicar la Regla 15.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 15.1, para ratificar la demanda, puesto que WTT nunca alegó que estuviese reclamando la pérdida de otras entidades. Además, arguyó que aun cuando la Póliza considerara asegurados adicionales, cada uno de ellos debía cumplir con el término dispuesto en la Póliza para incoar una reclamación, a saber, dos (2) años. Indicó que WTT fue quien único compareció dentro de ese periodo.

Por su parte, la representante legal de WTT, licenciada Teichka Rodriguez Muñoz (licenciada Rodríguez Muñoz), sostuvo que el planteamiento de Universal era temerario por tardío. Añadió que WTT era una firma de contabilidad dividida en varias entidades independientes, y procedía conceder un término para que la persona con derecho ratificara la demanda y se sustituyera a la parte demandante, conforme a la Regla 15.1 de Procedimiento Civil, *supra*. Además, explicó que todas las entidades habían sido incluidas en la reclamación extrajudicial y el informe de su perito consideraba a todas estas por igual.

Escuchados los argumentos de las partes, el foro primario expresó que el planteamiento debió haberse realizado en el año 2021, cuando Universal recibió el informe pericial de WTT. Expresó que el descubrimiento de prueba se realizó con todas las entidades y estas fueron consideradas en los informes periciales de ambos peritos. Ante ello, concedió un término de diez (10) días para que las alegaciones de la demanda fueran ratificadas y se unieran al pleito todas las entidades con derecho a reclamar. Además, señaló nuevamente el juicio en su fondo del 12 al 16 de febrero de 2024.

Así las cosas, el 21 de julio de 2023, WTT instó una *Moción solicitando autorización para presentar segunda demanda enmendada* a los fines de incluir a CCG, ISSA, T&S y THP como partes demandantes y ratificar la *Demanda.*[24]

Luego, el 10 de agosto de 2023, Universal se opuso mediante una *Oposición a "Moción solicitando autorización para presentar segunda demanda enmendada".*[25] En lo pertinente, reiteró que los reclamos por pérdidas de ingresos de CCG, ISSA, T&S y THP estaban prescritos, por lo que no procedía la enmienda solicitada. Detalló que las entidades en cuestión constituían personas jurídicas distintas, separadas y no relacionadas a la operación comercial de WTT, por lo que cada una tenía legitimación activa para exigir el cumplimiento de las disposiciones de la Póliza dentro del término de dos (2) años dispuesto. Indicó que durante la investigación relacionada a la reclamación número 2008799, Universal consideró la documentación financiera de todas las entidades que trabajaban para la fecha del huracán María en la propiedad, y posteriormente, el 27 de diciembre de 2019, realizó una oferta de pago por la pérdida de ingresos a WTT, CCG, ISSA, y T&S.

---

[24] Íd., entrada Núm. 99.
[25] Íd., entrada Núm. 107.

Adujo que dicho ofrecimiento interrumpió el plazo prescriptivo, por lo que un nuevo término comenzó a transcurrir el 27 de diciembre de 2019. Es decir, que la parte apelada tenía hasta el 27 de diciembre de 2021, para instar su reclamación. No obstante, sostuvo que quien único entabló la acción judicial fue WTT y, toda vez que carecía de legitimación activa, no interrumpió la prescripción respecto a las demás entidades.

De otra parte, reiteró que la Regla 15.1 de Procedimiento Civil, *supra*, no era de aplicación al caso, pues WTT nunca alegó que estaba reclamando el derecho correspondiente a otro, ni intentó vindicar el derecho de otro, sino que sólo reclamó su derecho.

El 21 de agosto de 2023, WTT instó una *Respuesta a "Oposición a 'Moción solicitando autorización para presentar segunda demanda enmendada'"* en la que arguyo que, desde inicios del pleito, Universal conocía la totalidad de la reclamación presentada, y el descubrimiento de prueba había sido específico sobre cada una de las entidades.[26] Añadió que la interpretación de Universal en cuanto a la Regla 15.1 de Procedimiento Civil, *supra*, resultaba contraria al propio texto de la norma y no estaba sustentada por derecho alguno. Precisó además que la referida regla no exigía que la demanda se presentara por un tercero con el propósito de vindicar los derechos de otro. En ese sentido, arguyó que la ratificación del pleito se retrotraía a la fecha de radicación de la *Demanda*, por lo que las reclamaciones de las entidades no estaban prescritas.

Tras varios escritos presentados por ambas partes en atención al mismo asunto[27], el 14 de septiembre de 2023, notificada al próximo día, el TPI emitió *Orden* mediante la cual autorizó la presentación de la segunda demanda enmendada y dio por

---

[26] Íd., entrada Núm. 110.
[27] Íd., entradas Núm. 111, 112, 113, 115 y 116.

ratificado el pleito por CCG, ISSA, T&S y THP.[28] Como parte de su determinación, el foro primario hizo constar que Universal no planteó la falta de legitimación activa de WTT en ninguna de las etapas procesales del caso, sino hasta previo al comienzo del juicio en su fondo. Hizo constar que, tras discutir el asunto en corte abierta, la representación legal de la parte demandada admitió que las entidades no incluidas en la *Demanda* originalmente habían formado parte del descubrimiento de prueba, e incluso afirmó que, de permitirse la enmienda, no sería necesario realizar descubrimiento de prueba adicional. Esgrimió que el reclamo de las demás entidades no era sorpresivo, pues el caso se estuvo litigando activamente como si estas formaran parte propiamente del pleito. Añadió, que la Regla 15.1 de Procedimiento Civil, *supra*, permitía la enmienda solicitada y esta se consideraría retrotraída a la fecha de la *Demanda* original.

Así las cosas, el 17 de septiembre de 2023, la parte apelada instó *Segunda Demanda Enmendada*, mediante la cual comparecieron todas las entidades con derecho a reclamar.[29]

Luego, el 19 de octubre de 2023, Universal presentó una *Contestación a Segunda Demanda Enmendada* en la que alegó afirmativamente que los reclamos de las entidades incluidas como parte demandante estaban prescritos, por lo que el foro primario carecía de jurisdicción sobre ellos.[30]

El juicio en su fondo se llevó a cabo durante los días 12, 13 y 14 de febrero de 2024. Según se desprende de la *Minuta* del primer día, transcrita el 22 de febrero de 2024, la parte apelada presentó

---

[28] Íd., entrada Núm. 117. Resulta meritorio apuntar que, el 16 de octubre de 2025, Universal impugnó dicho dictamen ante este foro apelativo mediante un recurso de *Certiorari* identificado con el alfanumérico KLCE202301147. En dicha ocasión, resolvimos denegar el recurso. Véase, Entrada Núm. 130 en SUMAC-TPI. Posteriormente, la parte apelante presentó una *Petición de Certiorari* ante el Tribunal Supremo, CC-2023-0753, la cual fue declarada sin lugar. Véase, Entrada Núm. 146 en SUMAC-TPI.

[29] Íd., entrada Núm. 118.

[30] Íd., entrada Núm. 129.

como testigos al señor William Torres Torres, representante de WTT, y al señor Carlos Torres Bonilla, ajustador de Universal.[31] Durante el segundo día del juicio, el TPI calificó al CPA Mendoza Rivera como perito de la parte apelada para el cálculo de la pérdida de ingresos y este brindó su opinión pericial.[32] Luego, el 14 de febrero de 2024, testificó por la parte apelante el señor José R. Ortiz Rodríguez, también ajustador de Universal.[33] Además, el foro primario calificó a la CPA Rivera Menéndez como perito de la parte apelante para el cómputo de la pérdida de ingreso por interrupción de negocio, y esta expuso su opinión pericial.

A continuación, resumimos las porciones de la TPO atinentes al primer y tercer error señalado por la parte apelante en su recurso, los cuales consignaremos posteriormente.

**CPA Mendoza Rivera**

El CPA Mendoza Rivera adujo que era contador público autorizado aproximadamente desde 1990.[34] Manifestó que había realizado muchos trabajos en la industria de seguros, entre ellos, reclamaciones por *business income*.[35] Afirmó que había tomado cursos sobre pérdida de ingresos por interrupción de negocio[36], e indicó que tras el paso del huracán María, y a petición del Colegio de Contadores Públicos Autorizados de Puerto Rico, brindó alrededor de siete seminarios sobre *business income* a través de las distintas regiones de Puerto Rico, incluyendo uno en el estado de Florida.[37]

Por otra parte, manifestó que el resultado del caso no afectaba la cantidad final de su pago como perito en el caso, porque sus

---

[31] Íd., entrada Núm. 141.
[32] Íd., entrada Núm. 142. La Minuta fue transcrita el 22 de febrero de 2024.
[33] Íd., entrada Núm. 144. La Minuta también fue transcrita el 22 de febrero de 2024.
[34] TPO del 13 de febrero de 2024, pág. 170, líneas 6-9.
[35] Íd., líneas 21-25; pág. 171, líneas 3-14.
[36] Íd., pág. 173, líneas 16-25; pág. 174, línea 1.
[37] Íd., pág. 174, líneas 11-25; pág. 175, líneas 1-8.

honorarios no eran contingentes, ya que ello afectaría su objetividad en el caso.[38]

En cuanto a sus labores para con este caso, manifestó que solicitó (1) las planillas del año anterior al huracán María, (2) la póliza de seguro, específicamente sus hojas de declaración, el endoso de *business income* y los endosos que afectaban a este y, (3) detalles de las horas facturadas durante el periodo de restauración del cliente.[39] Explicó que según las disposiciones de la Póliza, para determinar la pérdida de negocio, se debía utiliza el ingreso neto del negocio antes de los daños causados, como si no hubiese ocurrido la pérdida, sin incluir ningún ingreso neto que pudiera resultar en un incremento favorable en el volumen de negocio.[40] Adujo que al evaluar las entidades del asegurado, observó que estas se dedicaban a vender horas de servicios, por lo que determinó que el mejor parámetro para definir su pérdida era a través de las horas que dejaron de vender.[41] Para ello, manifestó que comparó las horas vendidas por el asegurado en el periodo de restauración, con el mismo periodo del año anterior.[42]

A preguntas de la licenciada Rodríguez Muñoz, aclaró que solicitó información financiera de CCG, ISSA, THP y T&S.[43]

Luego, a preguntas del Tribunal, explicó que para poder determinar la pérdida bruta del volumen del negocio, calculó las horas que vendió el asegurado durante el año terminado el 30 de junio de 2017.[44] Indicó que dividió el ingreso bruto del asegurado entre el total de horas de ese mismo año, y ello le dio la tarifa promedio por hora que el asegurado facturó durante ese año.[45]

---

[38] Íd., pág. 179, líneas 10-15.
[39] Íd., pág. 180, líneas 18-25; pág. 181, líneas 1-2.
[40] Íd., pág. 190, líneas 20-25; pág. 191, líneas 1-5.
[41] Íd., pág. 194, líneas 17-25; pág. 195, líneas 1-3.
[42] Íd., pág. 195, líneas 4-10.
[43] Íd., pág. 214, líneas 19-22.
[44] Íd., pág. 221, líneas 13-16.
[45] Íd., líneas 17-21.

Arguyó que utilizó dicha tarifa promedio para determinar cuántas horas dejaron de vender las entidades tras el impacto del huracán María, y eso le proveyó la pérdida de ingreso bruto durante el periodo de restauración.[46] Arguyó que realizó dicho cálculo para cada una de las entidades.[47]

Expresó que después de realizar el cálculo de pérdida de ingreso bruto para todas las entidades, procedió a definir cuáles eran los gastos no recurrentes del asegurado, conforme a la Póliza.[48] Posteriormente, determinó la pérdida de ingresos del asegurado.[49]

Manifestó que la Póliza no establece una metodología específica a utilizarse para llegar al cálculo, y él utilizó el *gross receipt method*.[50] Sostuvo que, para validar los gastos, validó los más significativos y recurrentes, siendo estos la nómina, la renta y la depreciación.[51] Señaló que utilizó la misma metodología para CCG, ISSA, THP y T&S.[52]

De conformidad a su evaluación, estimó la pérdida de ingreso bruto en cerca de $295,000.00.[53] A dicha cantidad, le realizó los ajustes de las entidades que no tuvieron pérdidas, más los ajustes de gastos no continuos[54], sin incluir el periodo de espera, toda vez que no se habían afectado las horas laborables.[55] A base de ello, obtuvo un estimado de pérdida de ingresos de negocio de $249,000.00.[56]

Durante el contrainterrogatorio, reconoció que no aplicó el periodo de espera que establece la Póliza[57], y que determinó la

---

[46] Íd., líneas 21-25; pág. 222, líneas 1-2.
[47] Íd., pág. 223, líneas 15-19.
[48] Íd., pág. 227, líneas 18-25, pág. 228, línea 1.
[49] Íd., pág. 228, líneas 11-15.
[50] Íd., pág. 231, líneas 23-25; pág. 232, línea 1.
[51] Íd., pág. 235, líneas 1-5.
[52] Íd., pág. 237, líneas 12-18 y 22; pág. 238, líneas 7-14.
[53] Íd., pág. 245, líneas 13-14.
[54] Íd., líneas 15-22.
[55] Íd., líneas 23-25; pág. 246, líneas 1-6.
[56] Íd., pág. 246, líneas 7-9.
[57] Íd., pág. 253, líneas 17-22.

pérdida de negocio de las entidades a base de un periodo de suspensión.[58]

**CPA Rivera Menéndez**

La CPA Rivera Menéndez expresó que era contadora pública autorizada desde aproximadamente 1990.[59] Indicó que comenzó a trabajar para Universal "más o menos en el 1995"[60], hasta alrededor de 2002, cuando comenzó a laborar como analista independiente.[61] Arguyó que su relación actual con Universal era de contratista independiente y esta le pagaba por hora.[62]

De otro lado, señaló que, como parte de sus trabajos como contratista independiente, había evaluado reclamaciones de interrupción de negocio.[63]

Tras solicitar que se calificara como perito, la representación legal de la parte apelada llevó a cabo un *voir dire*. En este, la CPA Rivera Menéndez reconoció que no había realizado ningún trabajo de cálculo de pérdida de ingresos previo al paso del huracán María.[64] Precisó que Universal había sido la única empresa aseguradora para la cual había realizado cálculos de interrupción de negocio.[65] Más en detalle, sostuvo que desde 2017, Universal era la única empresa para la cual brindaba servicios de consultoría y la mayoría de sus ingresos dependían de dicho trabajo.[66] Afirmó que solo había tomado un curso relacionado a la pérdida de ingresos por interrupción de negocio, ofrecido luego del paso del huracán María por el Colegio de Contadores Públicos Autorizados de Puerto Rico.[67]

Ante ello, la licenciada Rodríguez Muñoz objetó la cualificación de la CPA Rivera Menéndez como perito por razón de

---

[58] Íd., pág. 263, líneas 16-25; pág. 264, líneas 1-15.
[59] TPO del 14 de febrero de 2024, pág. 391, líneas 15-20.
[60] Íd., pág. 397, líneas 16-25; pág. 398, líneas 1-2.
[61] Íd., pág. 400, líneas 3-11.
[62] Íd., líneas 24-25; pág. 401, líneas 1-2 y 17-21.
[63] Íd., pág. 401, líneas 10-13.
[64] Íd., pág. 405, líneas 20-25.
[65] Íd., pág. 406, líneas 23-25; pág. 407, líneas 1-2.
[66] Íd., pág. 407, líneas 21-25; pág. 408, líneas 1-4.
[67] Íd., pág. 408, líneas 23-25; pág. 409, líneas 1-2 y 17-21.

parcialidad y falta de criterio independiente.[68] El licenciado Ramos Cartagena contraargumentó que la CPA Rivera Menéndez había demostrado que tenía las cualificaciones para realizar el cómputo que se le pidió que realizara.[69] Ante ello, la licenciada Rodríguez Muñoz arguyó que lo testificado por la CPA Rivera Menéndez no representó su conocimiento especializado sobre el cómputo de pérdida de ingresos por interrupción de negocios.[70]

Escuchadas las argumentaciones de las partes, el TPI calificó a la CPA Rivera Menéndez como perito para el cálculo de pérdida de negocios.[71]

Continuando con el directo, la CPA Rivera Menéndez arguyó que en marzo de 2019, el señor Carlos Torres Bonilla se comunicó con ella para darle la encomienda de evaluar la reclamación de interrupción de negocio de WTT.[72] Manifestó que al observar el cómputo sometido por el asegurado, notó que este no estaba respaldado por información financiera, por lo que procedió a solicitar información.[73] Precisó que solicitó (1) los estados financieros adjudicados de 2016 y 2017; (2) las planillas de contribución sobre ingresos de 2016 y 2017; (3) los estados de ingresos acumulados de enero a agosto de 2017; (4) los estados de ingresos y gastos mensuales para los meses reclamados; (5) las planillas de IVU de 2016 y 2017; (6) la nómina para el periodo reclamado y, (6) evidencia de pago de renta para los meses de septiembre y octubre o los meses en que culminara la reclamación.[74] Arguyó que de toda esa información, no recibió, entre otros, los

---

[68] Íd., pág. 409, líneas 22-25; pág. 410, líneas 1-4.
[69] Íd., pág. 410, líneas 8-18.
[70] Íd., líneas 22-25; pág. 411, líneas 1-5.
[71] Íd., pág. 411, líneas 10-12.
[72] Íd., pág. 414, líneas, 15-25.
[73] Íd., pág. 415, líneas 1-11.
[74] Íd., pág. 417, líneas 12-23.

estados financieros auditados de 2016 y 2017, ni los estados de ingresos y gastos mensuales de 2016, 2017 y 2018.[75]

Por otro lado, a preguntas del licenciado Ramos Cartagena, indicó que el cómputo de la pérdida de ingresos de la reclamación en cuestión incluyó a varias entidades.[76]

Con respecto a su evaluación, arguyó que utilizó las disposiciones que establece la Póliza para ello.[77] Precisó que usó de referente la cubierta de *Business Interruption*, la disposición de la Póliza que indica que los ingresos generados en el periodo de restauración se van a deducir de la pérdida, y la cláusula de *loss determination*.[78] Arguyó que realizó su evaluación sobre el periodo de restauración que le indicó el ajustador José R. Ortiz Rodríguez, a saber, del 20 de septiembre de 2017 al 31 de diciembre de 2017.[79]

Manifestó que, en primer lugar, y tras su evaluación, determinó que determinó que todas habían generado ingresos para el periodo reclamado.[80] Explicó que para llegar a tal determinación, utilizó unas tablas en formato Excel provistas por el reclamante, que mostraban ingresos y gastos.[81] Sostuvo que luego procedió a determinar la pérdida de ingreso bruto.[82] Para ello, utilizó las planillas de 2016 y 2017[83], y realizó una proyección de ingresos para el año fiscal de julio 2017 a junio 2018.[84] Explicó que comparó los años fiscales 2016 y 2017[85] a los fines de establecer una tendencia de aumento o disminución de ingresos.[86] Como resultado, indicó

---

[75] Íd., pág. 419, líneas 4-13; pág. 427, líneas 13-23.
[76] Íd., pág. 421, líneas 17-23.
[77] Íd., pág. 435, líneas 1-4.
[78] Íd., líneas 13-22; pág. 436, líneas 8-9.
[79] Íd., pág. 437, líneas 9-15.
[80] Íd., pág. 438, líneas 23-25; pág. 439, líneas 15-18.
[81] Íd., pág. 439, líneas 19-25.
[82] Íd., pág. 443, líneas 3-4.
[83] Íd., pág. 447, líneas 5-9.
[84] Íd., pág. 445, líneas 12-20.
[85] Íd., pág. 446, líneas 2-3.
[86] Íd., líneas 4-10.

que las empresas reclamantes generaron más ingresos en 2017 que en 2016.[87]

Añadió que, para poder proyectar los ingresos generados en el año 2018, aplicó la misma tasa de aumento del año 2017.[88] Luego, distribuyó los ingresos proyectados equitativamente entre doce meses[89], puesto que no existía ningún patrón de ingresos.[90] Explicó que posteriormente procedió a determinar lo que generaron las entidades en el año fiscal 2017-2018, y para ello utilizó las planillas de dicho año[91] y balanceó los ingresos entre doce meses.[92]

Luego, comparó los ingresos proyectados con los ingresos generados y determinó la pérdida.[93] Explicó que realizó el mismo ejercicio para todas las entidades.[94]

Sostuvo que posteriormente, adjudicó al cómputo el ingreso neto y los gastos continuos de las entidades, a base de la planilla del año fiscal que terminó el 30 de junio de 2017.[95] Posteriormente, aplicó dichas tasas a la pérdida de ingreso bruto.[96] Después, realizó un ajuste por lo que correspondía al periodo del huracán María, a saber, del 20 al 30 de septiembre.[97] Eventualmente, calculó el periodo de espera[98] de doce horas que establece la Póliza.[99] A base de todo lo anterior, concluyó que no hubo pérdida de interrupción de negocio.[100]

Durante el contrainterrogatorio, la licenciada Rodríguez Muñoz confrontó a la CPA Rivera Menéndez en relación a los estados de ingreso y gastos de las entidades, luego de que esta mencionara

---

[87] Íd., líneas 12-13.
[88] Íd., pág. 447, líneas 21-23; pág. 448, líneas 2-7.
[89] Íd., pág. 452, líneas 11-12.
[90] Íd., líneas 15-18.
[91] Íd., pág. 455, líneas 23-25; pág. 456, líneas 1-7.
[92] Íd., pág. 456, líneas 13-18.
[93] Íd., pág. 461, líneas 14-19.
[94] Íd., pág. 463, líneas 14-15.
[95] Íd., pág. 469, líneas 3-15.
[96] Íd., pág. 474, líneas 9-14.
[97] Íd., pág. 479, líneas 21-25; pág. 480, líneas 1-7.
[98] Íd., pág. 487, líneas 11-16.
[99] Íd., líneas 21-22.
[100] Íd., pág. 493, líneas 1-3.

que nunca recibió dicha información. La licenciada Rodríguez Muñoz le mostró varias partes de una deposición que le fuese tomada previamente, en donde la CPA Rivera Menéndez mencionó que sí hizo había evaluado dicha información.[101]

Luego, a preguntas de la licenciada Rodríguez Muñoz, la CPA Rivera Menéndez arguyó que no había tenido acceso a los libros de contabilidad de la parte apelada.[102] No obstante, la primera le mostró un correo electrónico remitido a la CPA Rivera Menéndez donde precisamente se discutían asuntos relacionados a los libros de contabilidad.[103]

De otra parte, reconoció que no calculó el ingreso real generado por las entidades durante el periodo de restauración[104], y utilizó ganancias posteriores a dicho periodo para estimar las ganancias de las entidades durante éste.[105]

Así las cosas, el caso quedó sometido, y el 20 de mayo de 2025, notificada al día siguiente, el foro primario emitió la *Sentencia* apelada.[106] En esta, el TPI formuló ciento treinta (130) determinaciones de hechos. A continuación, transcribimos aquellas pertinentes a los asuntos traídos ante nuestra consideración:

[…]

26. La póliza, además, incluye una forma que extiende la lista de asegurados nombrados (*Extended Name Schedule*) a cualquier compañía o corporación que sea subsidiaria, asociada, afiliada y/o socia de WTT SE y/o WTT Inc. También incluye a cualquier compañía que haya sido formada o adquirida y/o sea controlada por WTT SE y/o WTT Inc. De igual manera, la lista se extiende a cualquier empresa sobre la cual WTT SE y/o WTT Inc. ostente titularidad o posea un interés mayoritario.

27. Consulting CPA, Torres & Soto, ISSA y THP son aseguradas adicionales bajo la póliza 09-560-

---

[101] Íd., pág. 506, líneas 21-25; pág. 508, líneas 2-10; pág. 510, líneas 7-17.
[102] Íd., pág. 510, líneas 23-25; pág. 511, líneas 1-2.
[103] Íd., pág. 511, líneas 3-21.
[104] Íd., pág. 546, líneas 16-25; pág. 547, líneas 1-7; pág. 549, líneas 8-17; pág. 550, líneas 16-24; pág. 552, líneas 23-25; pág. 553, líneas 1-11; pág. 554, líneas 2-9.
[105] Íd., pág. 523, líneas 20-25; pág. 524, líneas 1-19; pág. 531, líneas 12-24.
[106] Véase Entrada Núm. 156 en SUMAC-TPI.

000542855-0/000 a tenor con el "Extended Name Schedule".

[...]

30. La póliza incluye un endoso titulado "Business Income (and Extra Expense) Coverage Form" identificado como CP 00301012. (en adelante el "Endoso de BI de la Póliza") Véase, Exh[i]bit 1 Estipulado, págs. 43 a la 51.

31. ...

32. Sobre el periodo de espera, la póliza establece que solo pagará por la pérdida sostenida luego de las primeras 12 horas a contar desde el daño físico directo a la propiedad. Esto significa que la indemnización comienza a partir de las 12 horas luego del daño físico al Edificio Asegurado a consecuencia del paso del huracán María.

33. El Endoso de BI de la Póliza define *Ingreso de Negocio* ("Business Income") como: (a) El ingreso neto (ganancias o pérdidas netas antes de impuestos) que se habrían ganado o incurrido, y (b) los gastos operacionales continuos incurridos incluyendo la nómina. Exh[i]bit 1 Estipulado, pág. 43.

34. El Endoso de BI de la Póliza establece que Universal pagará por la pérdida real ("actual loss") de ingreso de negocio ("Business Income") sostenida debido a la "suspensión" necesaria de las "operaciones" durante el "periodo de restauración". Id.

35. El Endoso de BI de la Póliza establece que "suspensión" significa en parte "(a) la baja o paralización de las actividades de negocio...". Exh[i]bit 1 Estipulado, pág. 51.

36. El Endoso de BI de la Póliza establece que el periodo de restauración es el periodo de tiempo que comienza "(1) 72 horas luego del momento de la pérdida directa física o el daño para la cubierta de ingreso de negocio (periodo de espera), o (2) inmediatamente luego del momento de la pérdida directa física o daños para la cubierta de gastos adicionales". El periodo de restauración termina cuando ocurra lo primero entre: "(1) la fecha en que la propiedad debió ser reparada, reconstruida o reemplazada con velocidad razonable a una de cualidad similar en la ubicación descrita, o (2) el día que el negocio reanude operaciones en una nueva localización permanente." Id.

37. La Póliza establece que la pérdida sostenida (Loss Determination) será determinada basándose en: (1) el ingreso neto del negocio antes de la pérdida física o de haber ocurrido el daño; (2) El ingreso neto que probablemente hubiera generado el negocio si no hubiera ocurrido el daño físico, pero sin incluir el

ingreso neto que probablemente hubiera sido generado como resultado del aumento de volumen de negocio a consecuencia de condiciones favorables ocasionadas por el impacto de la causa de la pérdida cubierta [huracán María]; (3) Los gastos operacionales, incluyendo nómina, necesarios para reanudar las operaciones con la misma calidad de servicio que existía justo antes de la pérdida; y (4) otras fuentes de información relevante como récords financieros, facturas, contratos, entre otros. Exh[i]bit 1 Estipulado, pág. 48.

[...]

59. La parte demandante presentó una notificación de pérdida a Universal el 22 de febrero de 2018 por las pérdidas relacionadas al paso del huracán María. La notificación incluyó las pérdidas de ingresos por interrupción de negocio.

[...]

64. Durante el trámite de la reclamación, el ajustador de Universal Sr. Carlos Torres Bonilla-entendió que todas las entidades codemandantes/reclamantes estaban aseguradas bajo la póliza.

65. Luego de recibir la reclamación que incluía todas las entidades demandantes, Universal certificó cubierta bajo la Póliza.

66. Universal le informó al asegurado que tendría que evaluar todas las entidades bajo la póliza. A estos efectos, solicitaron información financiera específica de cada una de las entidades codemandantes/reclamantes.

[...]

78. El periodo de restauración para la reclamación de las entidades codemandantes comprendió desde el 20 de septiembre de 2017 al 31 de diciembre de 2017.

[...]

82. La CPA Rivera comenzó a trabajar para Universal para aproximadamente el 1995 como analista de contratos de construcción.

83. Posteriormente, la CPA Rivera fue promovida a la posición de vicepresidente asistente del departamento de fianzas de Universal.

84. Para el año 2002, la CPA Rivera comenzó a trabajar de analista y/o consultora independiente. Sin embargo, se mantuvo brindándole servicios a la

compañía Universal mediante servicios profesionales.

85. La CPA Rivera le ha brindado servicios, ya sea como empleada o contratista, a Universal desde el 1995 hasta el presente.

86. Actualmente, la CPA Rivera es contratista independiente de Universal.

[...]

90. Para la única aseguradora que la CPA Rivera ha trabajado cálculos de pérdida de ingreso por interrupción de negocios es para Universal.

91. Desde el paso del huracán María, a quien único la CPA Rivera le brinda sus servicios de consultoría es a Universal.

92. La mayor parte de los ingresos de la CPA Rivera actualmente dependen del trabajo que esta le rinde a Universal.

93. La CPA Rivera consideró ingresos que fueron generados con posterioridad al periodo de restauración y al periodo de suspensión.

94. Del informe de la CPA Rivera no surge que esta haya calculado el periodo de suspensión. La CPA Rivera no consultó con el ajustador de Universal en relación con el periodo de suspensión definido en la Póliza.

95. La CPA Rivera nunca calculó la pérdida real ("actual loss") de cada entidad durante el periodo de restauración.

96. La CPA Rivera no tenía conocimiento de cuáles fueron ni consideró los ingresos reales que generó cada entidad durante el periodo de restauración.

[...]

107. Para realizar su cálculo, el CPA Mendoza solicitó las planillas de contribución sobre ingresos de las entidades para el año previo al paso del huracán María, o sea, las planillas del año fiscal que culminó el 30 de junio de 2017. El CPA Mendoza no solicitó las planillas de contribución sobre ingresos para el año fiscal que culminó el 30 de junio de 2018.

108. El CPA Mendoza utilizó para su cálculo la información financiera de las entidades para el periodo justo antes de la pérdida, esto porque la póliza establece que la determinación de la pérdida va a estar basada en el ingreso neto del negocio antes de la pérdida física directa. A estos efectos, los ingresos luego del paso del huracán María y

posteriores a la pérdida no tiene pertinencia en su cálculo.

109. El CPA Mendoza utilizó las planillas de contribución sobre ingresos de las entidades para el año fiscal culminado en junio de 2017 para identificar cuál era el volumen de negocio de cada entidad demandante según reportado bajo juramento en las planillas y para identificar cuáles eran los gastos recurrentes y no recurrentes.

110. Para realizar su cálculo en el presente caso el CPA Mendoza utilizó los reportes de horas facturadas por cada entidad durante el periodo de reclamación para el año de la pérdida y ese mismo periodo el año anterior. Esto porque las entidades demandantes se dedican a vender horas de servicios profesionales.

111. El CPA Mendoza determinó que el mejor parámetro para definir la pérdida de estas entidades es calculando las horas que dejaron de vender a consecuencia de la interrupción de negocios luego del paso del huracán María.

112. El CPA Mendoza realizó una comparación de las horas vendidas por cada entidad durante el periodo de restauración con el mismo periodo el año anterior. De esta manera determinó cuántas horas dejaron de vender las entidades a consecuencia del impacto del huracán María. Dicho cálculo evidenció un impacto.

113. El CPA Mendoza aplicó un ajuste (reducción) en su cálculo de horas dejadas de facturar para el mes de septiembre por el paso del huracán Irma debido a que esas horas no corresponden a esta reclamación.

114. Para realizar su cálculo, el CPA Mendoza dividió el volumen de negocio del año fiscal 2016-2017 (según reportado en las planillas bajo juramento) entre el total de horas facturadas durante ese año fiscal. Eso para establecer una tarifa por hora promedio que facturó cada entidad a sus clientes durante ese año.

115. Luego de determinar la cantidad de horas que las empresas dejaron de vender durante el periodo de restauración (en comparación con el mismo periodo el año anterior) esa cantidad fue multiplicada por la tarifa promedio por hora. El resultado de esto es la pérdida de ingreso bruto de cada entidad.

116. El cálculo antes descrito, el CPA Mendoza lo realizó individualmente para cada una de las entidades demandantes.

117. Luego de identificar el ingreso bruto de cada una de las entidades, conforme requiere la póliza, el

CPA Mendoza procedió a identificar los gastos no recurrentes de cada entidad. Esto porque la póliza establece que únicamente pagará el ingreso neto más los gastos recurrentes.

118. El ingreso neto más los gastos recurrentes matemáticamente es lo mismo que el ingreso bruto menos los gastos no recurrentes. El CPA Mendoza realizó su cálculo de esta última manera.

119. Para validar los gastos más significativos y recurrentes, el CPA Mendoza utilizó los gastos que cada entidad reflejó en su planilla de contribución sobre ingresos. El CPA Mendoza identificó los gastos que entendía fueron no recurrentes, o sea, los gastos que dejaron de pagarse como resultado de la interrupción de negocios.

120. Luego de identificar los gastos no recurrentes para cada entidad, el CPA Mendoza procedió a restarle al total de ingreso bruto que se había calculado previamente, la cantidad de gastos no recurrentes.

121. ....

122. El CPA Mendoza utilizó la misma metodología para todas las entidades reclamantes.

[...]

125. El CPA Mendoza no aplicó a su cálculo una reducción por las 12 horas del periodo de espera porque, al haberse sentido los efectos del huracán en horas de la tarde, el daño físico directo a la propiedad (que marca el comienzo del periodo de espera) fue en horas de la tarde, por lo que el periodo de doce horas no afectó horas laborables.

Cónsono a estas, y al amparo de la prueba testifical, documental y pericial presentada, el TPI concluyó que la parte apelante sufrió una pérdida de ingresos de negocio a consecuencia de la suspensión de labores durante el periodo de restauración luego del huracán María. Razonó que dicha pérdida estaba cubierta por la Póliza y todas las entidades comparecientes ejercieron válidamente su derecho a reclamar la indemnización correspondiente.

Añadió que, tras el trámite de la reclamación extrajudicial, Universal había emitido una oferta de pago mediante la cual reconoció la pérdida de ingresos por interrupción de negocios, y el ordenamiento jurídico no permitía que se retractara.

De otro lado, determinó que la parte apelada no presentó prueba suficiente para sustentar su reclamación de daños bajo el Código Civil, ni la alegación de temeridad, por lo que desestimó dicha causa de acción y no impuso honorarios por temeridad.

Cónsono a todo lo anterior, el TPI declaró Ha Lugar la *Segunda Demanda Enmendada* y razonó que Universal había incurrido en incumplimiento de contrato. Consecuentemente, le ordenó el pago de $78,467.00 a favor de T&S; $61,154.00 a favor de CCG; $24,728.00 a favor de ISSA y $84,893.00 a favor de THP, para un total de $249,242.00, más el interés legal a razón de 8.75%.

Cabe señalar que, en su dictamen, el foro primario realizó un pormenorizado análisis con respecto a las opiniones periciales del CPA Mendoza Rivera y la CPA Rivera Menéndez.

En cuanto al primero, el TPI destacó su amplia experiencia en la industria de seguros, con especial atención a su participación como recurso docente en temas de pérdida de ingresos por interrupción de negocios luego del huracán María. Asimismo, llamó a la atención la independencia en su criterio, toda vez que su contratación en el caso no guardaba relación personal con el señor Torres, representante de WTT, ni sus honorarios dependían del resultado del caso. Con respecto a la metodología utilizada para calcular la pérdida de ingresos, señaló que había sido clara, completa y a tenor con las disposiciones de la Póliza. Precisó que el CPA Mendoza Rivera utilizó información previa al paso del huracán María, y determinó la pérdida de ingresos comparando las horas de servicios facturadas antes y durante el periodo de restauración. En ese sentido, le mereció mayor credibilidad su opinión pericial.

Sobre la segunda perito, arguyó que la independencia de su opinión estaba comprometida por su relación laboral continua con Universal, la cual versaba desde 1995 y constituía su fuente principal de ingresos. Asimismo, apuntó que había participado

directamente en la reclamación extrajudicial, pues fue quien preparó el cálculo que sirvió de base para la oferta inicial cursada por Universal. De otra parte, sostuvo que su metodología se apartó de las disposiciones de la Póliza, pues utilizó proyecciones e ingresos posteriores al huracán, no definió el periodo de suspensión, ni calculó la pérdida real durante el proceso de restauración. Además, señaló inconsistencias en su testimonio, particularmente sobre información que alegó no haber recibido, la cual se demostró que en efecto la tuvo ante sí.

En desacuerdo con la determinación del foro primario, Universal presentó el recurso de *Apelación* que nos ocupa y le imputó al TPI la comisión de los siguientes errores:

> Erró el TPI al declarar con lugar el reclamo de cumplimiento específico contractual de las apeladas a base de una apreciación deficiente de la prueba oral que dio lugar a determinaciones de hecho erróneas y deficientes.
>
> Erró el TPI al no desestimar el reclamo de cumplimiento específico contractual de las apeladas CCG, ISSA, THP y T&S por prescripción.
>
> Erró el TPI al declarar con lugar el reclamo de cumplimiento específico contractual de las apeladas otorgándole mayor valor probatorio a la opinión del perito de las apeladas sin validar de forma alguna su cómputo y la confiabilidad de sus bases ni refrendarlo bajo las disposiciones de la póliza.

En primer orden, alega que el TPI incidió al no incluir determinaciones de hechos fundamentales para la resolución del caso. Además, impugna varias determinaciones de hecho consignadas por el TPI, toda vez que entiende que estas no están sustentadas por la prueba que tuvo el foro primario ante su consideración. En ese mismo contexto, indica que el dictamen carece de un análisis que valide los datos utilizados por el CPA Mendoza Rivera.

De otra parte, aduce que CCG, ISSA, THP y T&S no comparecieron al reclamo judicial dentro del término prescriptivo

para ello, por lo que su causa de acción está prescrita. Sostiene que WTT carecía de legitimación activa para reclamar daños de estas entidades, y que el haber solicitado o recibido prueba de dichas entidades no constituyó un reconocimiento de deuda por su parte.

Posteriormente, Universal presentó un *Alegato Suplementario* en el que reprodujo los mismos argumentos esbozados en su recurso de *Apelación.*[107]

El 6 de octubre de 2025, la parte apelada presentó una *Oposición a Apelación y a Alegato Suplementario*, en el que suplica la conformación de la *Sentencia* recurrida.[108] Esgrime que Universal no incluyó fundamento alguno para que este Tribunal intervenga con las determinaciones de hechos del TPI, o que estas constituyen error manifiesto, pasión, prejuicio o parcialidad. Por lo que, la determinación del foro recurrido está basada en la prueba que tuvo ante sí.

Por otro lado, sostiene que, mediante su segundo señalamiento de error, Universal pretende crear una controversia inexistente al enfocar el mismo en el tema de prescripción, toda vez que la decisión del TPI en cuanto a la causa de acción de las entidades se basó completamente en la Regla 15.1 de Procedimiento Civil, *supra.* Añade que la referida regla establece claramente que aplica a casos que se tramitan a nombre de una persona que no es la que por ley tiene el derecho que se reclama, por lo que sí aplica al caso.

En adelante, evaluaremos las normas jurídicas atinentes a los errores planteados por la parte apelante.

---

[107] Véase Entrada Núm. 8 del recurso en SUMAC-TA.
[108] Véase Entrada Núm. 11 del recurso en SUMAC-TA.

### III.

### A.

La Regla 42.2 de Procedimiento Civil de 2009, *supra*, R. 42.2, establece que las determinaciones de hecho sujetas a un testimonio oral no se dejarán sin efecto a menos que sean erróneas y se dará la debida consideración que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. En esa línea, el Tribunal Supremo ha resuelto que no intervendremos ni alteraremos innecesariamente las determinaciones de hecho que haya formulado el Tribunal de Primera Instancia, luego de presenciar, evaluar y admitir la prueba presentada en el juicio. ***Suárez Cáceres v. Com. Estatal Elecciones***, 176 DPR 31, 65 (2009). Consecuentemente, no podemos intervenir en las determinaciones de hecho, apreciación de la prueba y adjudicaciones de credibilidad de los testigos en "ausencia de error, perjuicio, pasión y parcialidad". ***Argüello v. Argüello***, 155 DPR 62, 79 (2001). Es por eso que se les brinda deferencia a las determinaciones de hecho realizadas por el juez de instancia. ***Sucn. Rosado v. Acevedo Marrero***, 196 DPR 884, 917 (2016). La frase "en ausencia de error, perjuicio, pasión y parcialidad" hace referencia a cuando el juzgador no actúa motivado por inclinaciones personales de tal modo que adopta posiciones, rechazos o preferencias con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba que se reciba o se tome en sala. ***Pueblo v. Hernández Doble***, 210 DPR 850, 864-865 (2022) citando a ***Dávila Nieves v. Meléndez Marín***, 187 DPR 750, 782 (2013). Este principio está cimentado en que las determinaciones del TPI están revestidas de una presunción de corrección y regularidad, pues es dicho foro quien estuvo en mejor posición de aquilatar la prueba testifical desfilada, por lo que sus determinaciones merecen nuestra deferencia. ***Argüello v. Argüello***, supra; ***Pueblo v. Rivera Nazario***, 141 DPR 865, 893 (1996). Así, no

podemos descartar y sustituir bajo nuestras propias apreciaciones basadas en el expediente las determinaciones del foro primario. *Rolón v. Charlie Car Rental, Inc*, 148 DPR 420, 434 (1999). El juez de instancia es "el que tiene la oportunidad de poder ver a los testigos, observar su manera de declarar, apreciar sus contradicciones, dudas, vacilaciones e ir creando gradualmente en su consciencia la convicción en cuanto a si hay o no derecho al remedio solicitado". *Figueroa v. American Railroad Co. Of PR*, 64 DPR 335, 339 (1944). En vista de ello, el foro primario es a quien la ley le concede la facultad de examinar la prueba y determinar la credibilidad de los testigos, por ende, nosotros no estamos en posición de alterar las conclusiones de un juez de instancia. Íd.

**B.**

El perito "es una persona que, a través de la educación o experiencia, ha desarrollado un conocimiento o destreza sobre una materia de manera que puede formar una opinión que sirva de ayuda al juzgador". *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 207 (2023) citando a *S.L.G. Font Bardón v. Mini-Warehouse,* 179 DPR 322, 338 (2010), (traduciendo a *Black´s Law Dictionary*, 8th ed., Minn., Thomson West, 2004, pág. 619.) Véase, además, la Regla 703 de las de Evidencia, 32 LPRA Ap. VI, R. 703. El perito ha sido considerado como "'la persona entendida, el individuo competente, idóneo, por tener unas determinadas aptitudes y conocimientos, por poseer una adecuada capacidad'". *S.L.G. Font Bardón v. Mini-Warehouse*, supra, citando a *San Lorenzo Trad., Inc. v. Hernández*, 114 DPR 704, 709 (1983).

La función del perito en un litigio es auxiliar al tribunal. *Pueblo v. Soto González,* 149 DPR 30, 32 (1999) (Sentencia). Véase, además, la Regla 702 de las de Evidencia, *supra.* R. 702. En ese sentido, nuestro Derecho Probatorio rige lo atinente a la admisibilidad, la calificación, y el valor probatorio que ha de

concederle el juzgador al testimonio de un perito. Reglas 702 y 703 de las de Evidencia, *supra,* R. 702 y 703. Véase, además, E. Rivera García, *El Valor del Testimonio Pericial en los Procedimientos Judiciales*, 47 Rev. Jur. U. Inter. P.R. 87, 96 (2013). La admisibilidad de un testimonio pericial será determinada por el tribunal a tenor con lo dispuesto en la Regla 403 de las de Evidencia, *supra*, R. 403. Véase, además, la Regla 702 de ese mismo cuerpo de Reglas. El foro de primera instancia deberá resolver si el testigo está calificado como perito o las partes podrían estipular su calificación. Regla 703 de las de Evidencia, *supra*, R. 703. "[A]l momento de que el tribunal determine si un testigo cualifica como perito y, por ende, si es admisible su testimonio pericial, lo que se requiere es que posea un conocimiento científico, técnico o especializado que sea de ayuda a la juzgadora o al juzgador para poder entender la prueba o determinar un hecho en controversia". ***S.L.G. Font Bardón v. Mini-Warehouse***, supra, pág. 344.

Nuestro ordenamiento jurídico permite a las partes presentar prueba para impugnar o sostener la credibilidad del perito y, en consecuencia, incidir sobre el valor probatorio de su testimonio. Regla 703 de las de Evidencia, ante, R. 703; E. Rivera García, *op. cit.*, pág. 96. El tribunal no está obligado a aceptar las conclusiones de un perito. ***S.L.G. Font Bardón v. Mini-Warehouse***, supra, pág. 346; E. Rivera García, *op. cit.*, pág. 101. Véase, además, ***Pueblo v. Montes Vega***, 118 DPR 164, 170-71 (1986); ***Pueblo v. Marcano Pérez***, 116 DPR 917, 928 (1986); ***Velázquez v. Ponce Asphalt***, 113 DPR 39, 48 (1982); ***Pueblo v. Dones***, 56 DPR 211, 222 (1940). Cónsono con lo anterior, si el perito no le merece credibilidad al juzgador, este puede rechazar su testimonio. ***S.L.G. Font Bardón v. Mini-Warehouse***, supra; ***Pueblo v. Dones***, supra.

Una vez el testigo perito sea cualificado, el juzgador, guiado por los factores esbozados en la Regla 702 de las de Evidencia,

*supra*, R. 702, le concederá el valor probatorio que le merezca. **S.L.G. Font Bardón v. Mini-Warehouse,** supra, pág. 343. Estos factores son:

> (a) si el testimonio está basado en hechos o información suficiente;
> (b) si el testimonio es el producto de principios y métodos confiables;
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
> (e) las calificaciones o credenciales de la persona testigo, y
> (f) la parcialidad de la persona testigo.

Los factores antes mencionados fueron establecidos tras la aprobación de las Reglas de Evidencia de 2009. El Comité Asesor de dichas Reglas evaluó en extenso los criterios jurisprudenciales que prevalecían en las cortes federales, e incorporó un criterio de valor probatorio basado en los factores de confiabilidad. Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, *Informe de las Reglas de Derecho Probatorio*, Marzo 2007, pág. 422. Sin embargo, el Comité señaló que: "[l]os criterios mencionados en el texto de la Regla 702 no son una lista taxativa y restrictiva. Existen otros factores que muy bien pudieran afectar el valor probatorio del testimonio pericial. Se trata de una determinación en la que el tribunal de instancia tiene amplia discreción y flexibilidad". Íd., pág. 424.

### C.

En nuestro ordenamiento jurídico, como norma general, todo pleito debe ser tramitado a nombre de la persona que por ley tenga el derecho que se reclama. Regla 15.1 de Procedimiento Civil, *supra*; **Álvareztorre Muñiz v. Sorani Jiménez**, 175 DPR 398, 419 (2009); **Allende Pérez v. García**, 150 DPR 892, 905 (2000). No obstante, a modo de excepción, la Regla 15.1 de Procedimiento Civil, *supra*, dispone que el cuando un reclamante en un pleito no sea quien por

ley tiene capacidad para exigir el derecho que reclama, el pleito no será desestimado inmediatamente. Regla 15.1 de Procedimiento Civil, supra; *Allende Pérez v. García*, supra. Por el contrario, la aludida regla establece que en tales circunstancias, y luego de que se haya presentado objeción, el TPI deberá conceder un tiempo razonable para que la persona con derecho ratifique la presentación del pleito o se una al mismo, o se sustituya en lugar de la parte promovente. Íd. Dicha acto tendrá el mismo efecto que si el pleito se hubiere incoado por la persona con derecho. Íd.

Permitir la ratificación del pleito, o la unión o sustitución de la parte promovente a este tiene como fin evitar la pérdida de un derecho y la comisión de una injusticia, permitiendo que la enmienda se retrotraiga al inicio del pleito, aun cuando el término prescriptivo hubiese vencido al momento de presentarse la enmienda. *Allende Pérez v. García*, supra, págs. 905-906.

## IV.

En el caso de ante nos, en su primer señalamiento de error, Universal sostiene que el TPI incidió al declarar con lugar la *Demanda*, basado en una apreciación deficiente de la prueba oral, lo que, a su juicio, ocasionó que consignara determinaciones de hecho erróneas. Arguye, además, que el foro primario omitió determinaciones de hechos fundamentales y erró al otorgarle credibilidad al CPA Mendoza Rivera, a pesar de que este, según plantea, se apartó de los términos contractuales establecidos en la Póliza al calcular la pérdida de ingreso de negocio.

En oposición, la parte apelada plantea que Universal no logró demostrar ni fundamentar que las determinaciones del TPI constituyen error manifiesto, pasión, prejuicio o parcialidad. Sostiene que los hechos que Universal identifica como fundamentales para el caso son irrelevantes y contrarios a la evidencia admitida por el TPI.

De entrada, advertimos que en este primer señalamiento de error, Universal se limita a esbozar varias determinaciones que entiende deben ser enmendadas o añadidas a la *Sentencia* recurrida, para reflejar hechos que, a su entender, resultan esenciales para la resolución del caso. No obstante, esta no explica, ni argumenta, de qué forma tales cambios o añadiduras influirían en el resultado del pleito. En esencia, sus argumentos reflejan una mera discrepancia con la valoración de la prueba efectuada y la adjudicación de credibilidad realizada por el foro primario.

No obstante, tras un análisis objetivo, sereno y cuidadoso del expediente del caso y de la TPO estipulada, constatamos que las determinaciones de hechos consignadas por el TPI están ampliamente sustentadas en la prueba testifical, documental, y pericial que este tuvo ante su consideración. En el caso particular de las opiniones periciales, el foro primario aquilató los testimonios del CPA Mendoza Rivera, así como el de la CPA Rivera Menéndez y, en el ejercicio de su función adjudicativa, otorgó mayor credibilidad a la metodología y las conclusiones vertidas por el CPA Mendoza Rivera.

Conforme al derecho probatorio vigente, el TPI goza de amplia discreción para determinar el valor probatorio que le merece un perito, según los factores de confiabilidad delineados en la Regla 702 de Evidencia, *supra*, y no viene obligado a acoger sus conclusiones. **S.L.G. Font Bardón v. Mini-Warehouse**, supra, pág. 346; E. Rivera García, *op. cit.*, pág. 101. Véase, además, **Pueblo v. Montes Vega**, supra; **Pueblo v. Marcano Pérez**, supra; **Velázquez v. Ponce Asphalt**, supra; **Pueblo v. Dones**, supra.

La mera inconformidad de Universal con la valoración del testimonio pericial del CPA Mendoza Rivera no constituye, por sí sola, base suficiente para que este tribunal intervenga con las determinaciones del foro primario. En armonía a lo reseñado sobre

la Regla 42.2 de Procedimiento Civil, *supra*, y su jurisprudencia interpretativa, reconocemos que el foro primario estuvo en mejor posición para evaluar la prueba desfilada y aquilatar la credibilidad de los testigos. ***Rolón v. Charlie Car Rental, Inc***, supra; ***Figueroa v. American Railroad Co. Of PR***, 64 DPR 335 (1944). En ausencia de error, perjuicio, pasión o parcialidad, nos abstenemos de alterar sus atinadas determinaciones y damos deferencia a su apreciación de la prueba. El primer error no fue cometido.

Mediante su segundo señalamiento de error, Universal sostiene que el TPI erró al no desestimar el reclamo de CCG, ISSA, THP y T&S. Insiste en que sus causas de acción están prescritas, toda vez que no presentaron su reclamación judicial dentro del término de dos (2) años que establece la Póliza. Añade que en el presente caso no aplican las disposiciones de la Regla 15.1 de Procedimiento Civil, *supra.*

En relación a dicho asunto, la parte apelada aduce que Universal ignora por completo el propio texto de la referida Regla 15.1 de Procedimiento Civil*, supra*, y la interpretación que ha realizado el Tribunal Supremo.

Conforme surge del voluminoso expediente, CCG, ISSA, THP y T&S están cubiertas por la Póliza objeto de controversia, y sus pérdidas formaron parte del descubrimiento de prueba realizado por Universal y WTT. Si bien es cierto que el pleito fue inicialmente incoado por WTT, las pérdidas reclamadas incluían las de CCG, ISSA, THP y T&S, por lo que sus derechos estaban implícitamente representados desde el inicio del caso.

Adviértase, además, que no fue hasta transcurridos varios años de litigio que Universal, por primera vez, levantó la falta de legitimación activa, alegando que WTT no tenía derecho a presentar la demanda a nombre de las demás entidades. A pesar de que Universal insiste en que no aplica la Regla 15.1 de Procedimiento

Civil, *supra,* es precisamente en tales circunstancias que resulta aplicable. Según pormenorizado, cuando se levanta una objeción por falta de legitimación activa debido a que un pleito ha sido incoado por una persona que no es titular del derecho reclamado, el caso no se debe desestimarse automáticamente. Regla 15.1 de Procedimiento Civil, *supra*; ***Allende Pérez v. García***, supra, pág. 905. Por el contrario, el TPI debe conceder un tiempo razonable para que la persona con derecho ratifique la demanda, se una al pleito o se sustituya en lugar de la parte demandante. Íd. Dicha ratificación o sustitución tiene el mismo efecto que si la acción hubiese sido incoada desde un principio por la parte con derecho, de modo que el periodo transcurrido antes de la ratificación del pleito no se computa para propósitos de la prescripción. ***Allende Pérez v. García***, supra, págs. 905-906.

Al tenor de dicha disposición, el TPI concedió a las entidades interesadas un plazo de tiempo suficiente para ratificar la demanda y unirse al pleito, lo que se realizó mediante la presentación de la *Segunda Demanda Enmendada.* Este acto permitió que CCG, ISSA, THP y T&S ejercieran sus derechos como titulares directos de la reclamación, retrotrayendo el pleito a la fecha original de radicación. La ratificación se efectuó dentro del término concedido por el TPI, asegurando que la causa de acción de las entidades no se viera afectada por la prescripción contractual de dos (2) años. En consecuencia, resulta forzoso concluir que las causas de acción de CCG, ISSA, THP y T&S no están prescritas, y la determinación del TPI de permitir la ratificación y sustitución de las partes fue correcta en derecho. Por tanto, el segundo error tampoco fue cometido.

Por último, en su tercer señalamiento de error, Universal esgrime que el foro primario incidió al otorgarle mayor valor probatorio a la opinión del CPA Mendoza Rivera. Arguye que ambos peritos contaban con las mismas credenciales, y que el dictamen del

TPI carece de un análisis que valide los datos que utilizó el CPA Mendoza Rivera, ni su metodología al calcular la pérdida de ingresos por interrupción de negocios.

En cambio, la parte apelada arguye que fue la CPA Rivera Menéndez quien no siguió, y hasta ignoró las disposiciones de la Póliza al realizar su cálculo.

Según pormenorizado precedentemente al discutir el primer señalamiento de error, las determinaciones de hechos del foro primario, particularmente aquellas derivadas de la apreciación de credibilidad de los testigos gozan de deferencia. ***Sucn. Rosado v. Acevedo Marrero***, supra; ***Argüello v. Argüello***, supra. Esto, pues es el TPI quien tiene la oportunidad de observar directamente el testimonio, evaluar contradicciones y dudas, y formar convicción sobre la veracidad y confiabilidad de los peritos. ***Figueroa v. American Railroad Co. Of PR***, 64 DPR 335 (1944).

En el caso de marras, surge del expediente que el TPI valoró de manera integral la experiencia y especialización de cada perito en relación al cálculo de pérdida de ingresos por interrupción de negocio, constatando que el CPA Mendoza Rivera demostró tener vasta experiencia en el tema de cálculo de pérdida de ingresos por interrupción de negocios y la metodología que utilizó se ajustó a las disposiciones de la Póliza; mientras que la CPA Rivera Menéndez no siguió las cláusulas de la Póliza, utilizó ingresos posteriores al daño ocasionado por el huracán María para realizar su cómputo[109], e ignoró el cálculo necesario para establecer el ingreso real generado por las entidades durante el periodo de restauración[110]. Asimismo, el foro primario tomó en cuenta la relación prolongada de la CPA

---

[109] TPO del 14 de febrero de 2025, pág. 523, líneas 20-25; pág. 524, líneas 1-19; pág. 531, líneas 12-24.
[110] Íd., pág. 546, líneas 16-25; pág. 547, líneas 1-7; pág. 549, líneas 8-17; pág. 550, líneas 16-24; pág. 552, líneas 23-25; pág. 553, líneas 1-11; pág. 554, líneas 2-9.

Rivera Menéndez con Universal[111], y concluyó que ello podía afectar su independencia de criterio. Nótese además que, según surge de la TPO, la CPA Rivera Menéndez inicialmente negó haber tenido ante sí los estados de ingresos y gastos mensuales y los libros de contabilidad de las entidades, mas, durante el contrainterrogatorio, esta reconoció que sí los había evaluado.[112]

De conformidad a las Reglas 702 y 703 de las de Evidencia, *supra,* el juez o jueza del TPI determina el valor probatorio del testimonio pericial, considerando no solo las credenciales del perito, sino también la metodología empleada, los hechos en que se basó, la aplicación confiable de los principios técnicos y la posible parcialidad. A la luz de estos factores, el TPI concluyó que el testimonio del CPA Mendoza Rivera merecía mayor peso y confiabilidad que el de la CPA Rivera Menéndez. En ese sentido, subrayamos que la parte apelante no demostró que el foro primario incurriera en error manifiesto, perjuicio ni parcialidad en la decisión del TPI, por lo que procede brindar deferencia a su apreciación. No intervendremos con la credibilidad que el TPI otorgó a los testimonios periciales. El tercer error no fue cometido.

Toda vez que ninguno de los errores señalados fueron cometidos, y las determinaciones del foro primario encuentran amplio apoyo en la prueba vertida ante su consideración, procede confirmar el dictamen recurrido.

**V.**

Por los fundamentos pormenorizados, se confirma la *Sentencia* apelada.

---

[111] Íd., pág. 397, líneas 16-25; pág. 398, líneas 1-2; pág. 400, líneas 3-11 y 24-25; pág. 401, líneas 1-2, 10-13 y 17-21.
[112] Íd., pág. 508, líneas 2-11; pág. 510, líneas 23-25; pág. 511, líneas 1-21; pág. 540, líneas 1-7.

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones